### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CRYSTAL WRIGHT,                                ) | |
| 5853 Nebraska Avenue, NW                       ) | |
| Washington, DC 20015                           ) | |
|                                                ) | |
| BRANDON TURNER                                 ) | |
| 1931 Biltmore Street, NW                       ) | |
| Washington, DC 20009                           ) | |
|                                                ) | |
| TRACI R. DEAN                                  ) | |
| 1817A Biltmore Street, NW                      ) | |
| Washington, DC 20009                           ) | |
|                                                ) | |
| Plaintiffs,                                    ) | |
|                                                ) | Civil Action No. 16-cv-1556 |
| v.                                             ) | |
|                                                ) | |
| DISTRICT OF COLUMBIA,                          ) | |
| Serve: Mayor Muriel Bowser                     ) | |
| 1350 Pennsylvania Avenue, NW                   ) | |
| Washington, DC 20004       and                 ) | |
|                                                ) | |
| c/o Office of Attorney General                 ) | |
| 1 Judiciary Square                             ) | |
| 441 4th Street, N.W., 6th Fl. South             ) | |
| Washington, D.C. 20001                         ) | |
|                                                ) | |
| and                                            ) | |
|                                                ) | |
| Metropolitan Police Chief Cathy Lanier         ) | |
| 300 Indiana Avenue, N.W.                       ) | |
| Washington, DC 20004                           ) | |
|                                                ) | |
| Defendants.                                    ) | |
| _____        ) | |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

1

COME NOW the Plaintiffs, Crystal Wright, Brendan Turner, and Traci R. Dean, by and through their undersigned counsel, and complain of the Defendants as follows:

**THE PARTIES**

1. Plaintiff Crystal Wright is a natural person and a citizen of the United States and of the District of Columbia.

2. Plaintiff Brendan Turner is a natural person and a citizen of the United States and of the District of Columbia.

3. Plaintiff Traci R. Dean is a natural person and a citizen of the United States and of the District of Columbia.

4. Defendant District of Columbia is a municipal entity organized under the Constitution and laws of the United States. It is the seat of government of the United States. Article I, Section 8 of the Constitution gives Congress plenary authority to make laws governing the seat of government of the United States. Congress has chosen to delegate the majority of its power to make laws for the governing of the District of Columbia to the mayor and city council of the District.

5. Defendant Cathy Lanier is the Chief of the District of Columbia's Metropolitan Police Department ("MPD"). Defendant Lanier is responsible for executing and administering the District of Columbia's laws, customs, practices, and policies at issue in this lawsuit; has enforced the challenged laws, customs and

practices against plaintiffs, and is in fact presently enforcing the challenged laws, customs and practices against plaintiffs. Defendant Lanier is sued in both her individual and official capacities.

**JURISDICTION AND VENUE.**

6.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1343, 2201, 2202 and 42 U.S.C. § 1983 and § 1988.

7.    Venue lies in this Court pursuant to 28 U.S.C. § 1391.

**STATEMENT OF FACTS.**

**The Second Amendment.**

8.    The Second Amendment to the United States Constitution provides: "A well regulated Militia being necessary to the security of a free State, the right of the people to keep and bear Arms shall not be infringed."

9.    The Second Amendment guarantees individuals a fundamental right to keep and carry arms for self-defense and defense of others in the event of a violent confrontation. *District of Columbia v. Heller*, 554 U.S. 570 (2008); *McDonald v. Chicago*, 561 U.S. 742 (2010); *Caetano v. Massachusetts,* 577 U.S. __ (2016),

10.   Arms are "'weapons of offence, or armour of defence.' 1 Dictionary of the English Language 107 (4th ed.)" They are anything that a man [or woman] wears for his defense, or takes into his hands, or uses in wrath to cast at or strike another.'

3

1 A New and Complete Law Dictionary (1771)." *District of Columbia v. Heller*, 554 U.S. at 581.

11. The Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding. *Heller,* 554 U.S. at 582; *Caetano*, slip op. at 1 (per curiam).

12. Under the Second Amendment, the District of Columbia retains the ability presumptively to regulate the manner of carrying arms and may prohibit certain arms in narrowly defined sensitive places, prohibit the carrying of arms that are not within the scope of Second Amendment's protection such as unusually dangerous arms, and disqualify specific, particularly dangerous individuals from carrying arms. *See Heller,* 554 U.S. at 627.

13. Given the decision in *Heller*, The District of Columbia may not completely ban the keeping and bearing of arms for self-defense that are not unusually dangerous, deny individuals the right to carry arms in non-sensitive places, deprive individuals of the right to keep or carry arms in an arbitrary and capricious manner, or impose regulations on the right to keep and carry arms that are inconsistent with the Second Amendment. *See Caetano v. Massachusetts*, 577 U.S. ___ (2016); *Heller v. District of Columbia,* 801 F.3d 264 (D.C. Cir. 2015); *Palmer v. District of Columbia,* 59 F.Supp.3d 173 (2014).

**Tasers.**

14. Tasers are arms in common use for self-defense by civilians as well as by law enforcement.

15. Tasers are manufactured and sold by Taser International, Inc.

16. A Taser is an electronic control device ("ECD") that uses replaceable cartridges containing inert, compressed nitrogen to fire two small probes that are attached to insulated conductive wires. In the models generally marketed to non-law enforcement persons, the conductive wires are 15 feet (4.5 meter) in length.

17. Taser models generally marketed to law enforcement agencies use conductive wires with lengths up to 25 feet in length.

18. The probes are designed to penetrate the clothing of an attacker and imbed in the attacker's skin. Electrical energy is sent over the wires into the probes. The charge is transmitted between the two probes and is designed to disrupt the sensory and motor functions to inhibit muscular control of an attacker.

19. With a Taser exposure, the attacker is momentarily incapacitated to allow the person attacked to escape and call for law enforcement assistance, or in the case of a law enforcement officer, to allow for the apprehension of the suspect without further risk of injury to the officer or the suspect. *See* Exhibits 4 and 5.

20. The Taser's electronic charge lasts from five to thirty seconds depending on whether the civilian or the law enforcement model is employed.

21. The most commonly employed civilian Taser is a one shot device with a 30 second charge. Once fired the device can still be used as a direct contact stun device in the event of a missed shot or in the event of multiple assailants.

22. Taser International also manufactures Taser devices having the capacity for multiple shots. These multiple shot devices are commonly used by law enforcement personnel in the performance of their duties.

23. Tasers have several advantages over other non-lethal means of self-defense, such as self-defense sprays or contact weapons.

24. First, self-defense sprays must be administered generally within several feet of an assailant while a civilian model Taser can be deployed within 15 feet. The closer distance the assailant must be to a potential victim for the victim to employ a self-defense spray increases the danger to the potential victim. For example, it is generally recognized by law enforcement that an assailant wielding a contact weapon such as a knife or a club can be a lethal threat at distances of 21 feet or closer. *See* Dennis Tueller, *How Close is Too Close*, Police Policies Study Council, available at http://www.theppsc.org/Staff_Views/Tueller/How.Close.htm (originally published in the March 1983 Edition of SWAT Magazine).

25. Second, pepper sprays can often be ineffectual against highly intoxicated or highly agitated assailants. *See generally* Steven M. Edwards, et al., *Evaluation of Pepper Spray*, National Institute of Justice, U.S. Dept. of Justice,

Office of Justice Programs, Research in Brief (February 1997), available at https://www.ncjrs.gov/txtfiles/162358.txt.  Tasers, on the other hand, when effectively employed will likely stop an attack from an intoxicated or mentally disturbed attacker.

26. Third, for optimum effect, defense sprays should be deployed at the face of the attacker, which is a small target.  The Taser is most effective when deployed at other larger parts of the body of the attacker.

27. Fourth, defense sprays can end up being blown back at the victim if used in a windy environment, resulting in incapacitating the victim rather than the attacker.  This is not an issue with a Taser device.

28. Likewise, Tasers have advantages over the variety of contact weapons as well such as police type batons or knives.  Allowing an attacker to close to contact distance creates a high degree of danger to a potential victim.

29. Contact weapons can also be more difficult for persons of lesser strength to deploy, compared to a Taser.

30. Moreover, use of any contact weapon, such as a knife or club, carries a high degree of risk of death or serious bodily harm to the assailant, whereas risk of death or serious bodily harm from a Taser is minimal.

31.     On a related note, given that use of a knife or club qualifies as the use of deadly force, an individual using a knife or club to defend against a criminal attack, has a high legal standard to meet to sustain a claim self-defense.[1]

32.     Tasers have been widely used by law enforcement agencies throughout the United States and the world.  More than 18,000 law enforcement agencies use the devices.

33.     Studies have shown Tasers to reduce injuries to both law enforcement officers and to suspects.  The United States Department of Justice found that Tasers result in fewer injuries to suspects and officers than all other means of subduing suspects.

34.     In the event of deployment of a civilian Taser the device releases some 24 small confetti like tags called AFIDs which are packed into the firing mechanism. When the Taser cartridge is engaged, the AFIDs fly out of the Taser and scatter around the area where the device was utilized.

35.     The term AFID stands for Anti Felon Identification. Taser utilizes AFIDs to deter criminal misuse of its product.  Taser International can trace the purchaser of the device from data contained on an AFID.

---

[1] One is privileged to use deadly force such as a knife or a firearm in self-defense only where one reasonably believes that he or another innocent person is in imminent danger of death or serious bodily harm. *See, e.g., U.S. v. Peterson,* 483 F.2d 1222, 1229-30 & nn. 42-47 (D.C. Cir. 1973) (multiple cases cited in notes).

36. Tasers and other electronic weapons are in common use for self-defense. The Michigan Court of Appeals found that "Hundreds of thousands of Tasers and stun guns have been sold to private citizens," *People v. Yanna*, 297 Mich. App. 137, 144, 824 N.W. 2d 241, 245 (2012). Concurring in the *per curiam* reversal of the Massachusetts Supreme Judicial Court's upholding of a ban on stun guns, Justice Alito stated, "While less popular than handguns, stun guns are widely owned and accepted as a legitimate means of self-defense across the country." *Caetano v. Massachusetts*, 577 U.S. __, ___ (March 21, 2016) (Alito, J., concurring).

**District of Columbia Law.**

37. D.C. Code § 7-2502.01(a) provides with exceptions not pertinent to plaintiffs that "no person or organization in the District of Columbia ("District") shall receive, possess, control, transfer, offer for sale, sell, give, or deliver any destructive device."

38. D.C. Code § 7-2501.01(7) (D) defines "Destructive device" inter alia as, "Any device designed or redesigned, made or remade, or readily converted or restored, and intended to stun or disable a person by means of electric shock."

39. Thus, the District of Columbia outlaws the private possession by plaintiffs of a Taser or stun gun within the District.

40. A first violation of the District of Columbia's complete ban on the ownership or possession of Tasers or stun devices by non-law enforcement

personnel is punishable as a misdemeanor by a fine of up to $1,000, imprisonment of up to one year, or both. A second offense is punishable as a felony by a fine of up to $5,000, imprisonment of up to five years, or both. D.C. Code § 7-2507.06.

**Plaintiff Crystal Wright.**

41.    Plaintiff Crystal Wright is an individual who is outspoken on political matters. She operates a blog on the Internet under the name "Conservative Black Chick." As a result of her blog posts, she has been threatened with physical harm. One person sent her an email saying that he intended to break into her home and bash her head in.

42.    Ms. Wright has been trained in firearms and contemplates obtaining a firearm to protect herself in her home in accordance with District of Columbia law. She is ready, willing and able to use deadly force to defend herself and her home from a potentially lethal attack, if necessary and unavoidable.

43.    Plaintiff Wright, however, is aware that there are significant and adverse legal, financial, social and psychological ramifications of using deadly force to defend against a home invasion or personal attack. She is aware that even where use of deadly force is justified, a victim forced to use deadly force may be taken into police custody, arrested and prosecuted. She is aware that she would likely have to go to the expense of hiring an attorney to protect her rights in the criminal justice system. She is aware that she would be at the mercy of police, prosecutors and jurors

who will have weeks or months to second guess a decision to use deadly force made in seconds in the face of a threatened attack.

44. Ms. Wright is aware that even where use of deadly force is justified, a victim may be sued by the perpetrator if the perpetrator survives, or by the perpetrator's family, if the perpetrator does not survive. The victim may have to go to the expense of hiring an attorney to defend the civil proceeding and will be at the mercy of a jury second guessing in the comfort of a jury room the decision to use deadly force made in a seconds in the face of an attack.

45. Ms. Wright is aware that persons forced to use deadly force in their defense will likely suffer one or more types of psychological distress. *See generally,* Alexis Artwolh, *Deadly Force Encounters, What Cops Need to Know to Mentally and Physically Prepare for and Survive a Gun Fight* (1997), pp. 79-242 (hereinafter "Artwohl").

46. Ms. Wright is aware that persons forced to use deadly force in their defense will likely suffer from the withdrawal and isolation of friends and families, especially if their use of force results in the death of the perpetrator.

47. Ms. Wright is aware that persons forced to use deadly force in their defense will likely suffer from one or more manifestations of Post Violent Event Trauma ("PVET"). Manifestations of PVET can include sleep disturbance including sleeplessly or nightmares, sexual dysfunction or promiscuity, substance abuse,

depression or malaise, appetite disturbance, social withdrawal or social ostracism, aggression or avoidance syndrome and flashbacks. *See* Artwohl.

48. Ms. Wright is aware of the potential legal, economic and psychological ramifications of even the justified use of deadly force to defend herself or her home against a violent criminal attack.

49. Ms. Wright would prefer to minimize the likelihood that she would have to resort to deadly force in the event she is forced to defend herself or her home from a violent criminal attack.

50. In appropriate circumstances, Ms. Wright would prefer to utilize a Taser for defense of herself and her home due to its proven effectiveness and its proven record of minimizing injury to suspects and/or assailants.

51. Ms. Wright on May 24, 2016, sought to place an order with Taser International for a Taser Pulse model. A Taser International representative, however, declined the purchase, citing DC law which prohibited it from selling the device to a DC resident.

52. But for District law, Ms. Wright would acquire, possess, carry and where appropriate use a Taser device to protect herself and her home from criminal attack.

**Plaintiff Brandon Turner.**

53. Plaintiff Brenden Turner has twice been the victim of armed robbery. He fears the possibility of another potentially violent if not lethal confrontation. Yet, Mr. Turner is reluctant to obtain a firearm for personal defense for two reasons. First, he has a young child at home and is not comfortable having a firearm under that circumstance.

54. Second, Mr. Turner is aware of the significant legal, financial, social and psychological ramifications of using deadly force to defend against a home invasion or personal attack as discussed above in paragraphs 43-48, supra.

55. Mr. Turner would prefer to minimize the likelihood that he would have to resort to deadly force in the event he was forced to defend himself or his home from a violent criminal attack.

56. In appropriate circumstances, Mr. Turner would prefer to utilize a Taser for defense of himself, his family and his home due to its proven effectiveness and its proven record of minimizing injury to suspects and/or assailants.

57. Mr. Turner on July 13, 2016, sought to place an order with Taser International for a Taser Pulse model. In response, a Taser International representative, declined the purchase, citing DC law which prohibited it from selling the device to a DC resident.

58. But for D.C. law, Mr. Turner would acquire, possess, carry and where appropriate use a Taser device to protect himself, his family and his home.

**Plaintiff Traci R. Dean.**

59. Plaintiff Traci R. Dean is employed as a nurse. She often works late into the night. She desires to possess, carry and if necessary use a suitable arm for self-defense. Although she is legally able to register a handgun in the District of Columbia she is wary of owning a deadly weapon.

60. She is aware of the significant legal, financial and psychological ramifications of using deadly force such as a firearm to defend against a home invasion or personal attack discussed in paragraphs 43-48, supra.

61. Ms. Dean would prefer to minimize the likelihood that she would have to resort to deadly force in the event that it became necessary to defend herself or her home from a violent criminal attack.

62. Ms. Dean would prefer where appropriate to utilize a Taser for defense of herself and her home due to its proven effectiveness and its proven record of minimizing injury to suspects and/or assailants.

64. Ms. Dean on June 3, 2016, sought to place an order with Taser International for a Taser Pulse model. In response a Taser International representative, declined the purchase, citing District law which prohibited it from selling the device to a District resident.

65. But for D.C. law, Ms. Dean would acquire, possess, carry and where appropriate use a Taser device to protect herself and her home.

**FIRST CLAIM FOR RELIEF:**

**U.S. CONST., AMEND. II, 42 U.S.C. § 1983 AGAINST ALL DEFENDANTS**

66. D.C. Code § 7-2501.01(7)(D) and D.C. Code § 7-2502.01(a) together prohibit plaintiffs from acquiring, possessing and using a defensive arm in common use, i.e., a Taser. As such they violate plaintiffs' Second Amendment rights.

67. Defendants' laws, customs, practices and policies generally banning the acquisition, possession, carrying and use of Tasers and other electronic arms violates the Second Amendment to the United States Constitution, facially and as applied against the individual plaintiffs in this action, damaging plaintiffs in violation of 42 U.S.C. § 1983. Plaintiffs are therefore entitled to preliminary and permanent injunctive relief against such laws, customs, policies, and practices.

**SECOND CLAIM FOR RELIEF:**

**U.S. CONSTITUTION, AMEND. V, 42 U.S.C. § 1983.**

68. D.C. Code § 7-2501.01(7)(D)'s classification of Tasers as destructive devices is arbitrary and irrational and thus violates the due process clause of the Fifth Amendment to the United States Constitution in light of the plaintiffs Second Amendment rights to arms for self-defense that are not unusually dangerous.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs request that judgement be entered in their favor and against Defendants as follows:

1. Enter a declaratory judgement that the District of Columbia's classification of Tasers and other electronic arms as destructive devices is arbitrary and unreasonable under the Second and Fifth Amendments to the United States Constitution.

2. Enter a declaratory judgement that D.C. Code §7-2501(7)(D) and §7-2502.02(a)(4) to the extent that they ban the acquisition, possession, and use of Tasers and other electronic arms by law abiding persons within the District of Columbia violate the Second Amendment to the United States Constitution.

3. Enter an order preliminarily and permanently enjoining Defendants, their officers, agents, servants, employees, and all persons in active concert or participation with them who receive actual notice of the injunction, from enforcing D.C. Code §7-2501(7)(D) and §7-2502.02(a)(4) to ban the acquisition, possession, or use of Tasers and other electronic arms within the District of Columbia;

4. Enter an order awarding Plaintiff's their costs of suit, including attorney fees and costs pursuant to 42 U.S.C. §1988; and

5. Enter an order providing any other and further relief that the court deems just and appropriate.

> Respectfully submitted,
>
> **CRYSTAL WRIGHT**
>
> **TRACI DEAN**
>
> **BRENDAN TURNER**
>
> By: /s/ George L. Lyon, Jr.
> George L. Lyon, Jr. (D.C. Bar No. 388678)
> Arsenal Attorneys
> 2111 Wilson Blvd., 8th Floor
> Arlington, Virginia 22201
> 202-669-0442, fax 202-483-9267
> Attorney for Plaintiffs
> gll@arsenalattorneys.com

Dated: August 2, 2016