**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

CRYSTAL WRIGHT, et al.                         )
                                               )
                Plaintiffs,                    )
                                               ) Civil Action No. 1:16-cv-1556 (JEB)
        v.                                     )
                                               )
DISTRICT OF COLUMBIA and                       )
CATHY LANIER, in her official capacity as      )
Chief of Police for the Metropolitan Police    )
Department,                                    )
                                               )
                Defendants.                    )


# MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' APPLICATION FOR A PRELIMINARY AND PERMANENT INJUNCTION


George L. Lyon, Jr. (Bar No. 388678)
**ARSENAL ATTORNEYS**
2111 Wilson Blvd, 8th Floor
Arlington, Virginia 22201
(202) 669-0442
(202) 483-9267 Facsimile
gll@arsenalattorneys.com

*Counsel for Plaintiffs*

# *Table of Contents*

*Page*

Table of Authorities …………...............................................................................................ii

Summary of Argument …………...........................................................................................1

Introduction ………...............................................................................................................3

Argument ………....................................................................................................................5

I.  Introduction ………...........................................................................................................3

II.  Plaintiffs have standing to bring this action ...…………………………………….…..5

III.  Plaintiffs are entitled to a preliminary injunction …………………………………..…..7

IV.  Plaintiffs are likely to succeed on the merits of their claim that the
District's ban on Tasers and other electronic defensive arms violates
the Second Amendment ....................................................................................................7

    a.  The District of Columbia bans otherwise law-abiding residents
from keeping and bearing Tasers and other electronic arms .................................7

    b.  Tasers are arms under the Second Amendment ....................................................9

    c.  Tasers are neither dangerous nor unusual …………………………………....12

    d.  That the District allows possession of other arms does not save
its ban on Tasers and other electronic defensive arms ………………………….20

    e.  The court need not reach the question whether a narrower restriction
might be constitutional ……………………………………………………………21

    f.  The District's ban fails any measure of heightened constitutional
scrutiny ………...................................................................................................23

V.  Plaintiffs will continue to suffer irreparable harm in the
absence of preliminary relief ………...............................................................................30

VI.  The balance of equities tips overwhelming in plaintiffs' favor .......................................32

VII.  An injunction is in the public interest ...............................................................................32

VIII.  The court should enter final judgment for plaintiffs .........................................................33

Conclusion ………..............................................................................................................34

i

### *Table of Authorities*

**Cases**                                                                                       **Page**

*Aamer v. Obama*, 742 F.3d 1023 (D.C. Cir. 2014) ...................................................................7

*Bridenbaugh v. Freeman-Wilson,* 227 F.3d 848 (7th Cir. 2000) ...........................................6

\* *Caetano v. Massachusetts*, 577 U.S. __, slip op. (March 21, 2016) .................1, 9, 10, 19, 21, 22

*Caldwell v. Moore*, 968 F.2d 595 (6th Cir. 1992) ................................................................20

*Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290 (D.C. Cir. 2006) ...............30, 31

*City of Akron v. Rasden,* 663 N.E.2d 947 (Ohio Ct. App. 1995) ...................................................11

*Curtis 1000, Inc. v. Suess*, 24 F.3d 941 (7th Cir. 1994) ........................................................33

*Davis v. District of Columbia,* 158 F.3d 1342 (D.C. Cir. 1998) ...................................................30

*Cohen v. California,* 403 U.S. 15 (1971) .........................................................................22

*Dearth v. Holder,* 641 F.3d 499 (D.C. Cir. 2011) ...................................................................5, 6

*Dearth v. Holder,* 791 F.3d 32 (D.C. Cir. 2015) ...................................................................7

\* *District of Columbia v. Heller*, 554 U.S. 570
   (2008) ....................................1, 3, 5, 9, 10, 11, 12, 13, 19, 20, 21, 23, 24, 25, 27, 28

*District of Columbia v. Terrell,* Crim. No. 2015 CTF 1919 ...........................................................6

*Elrod v. Burns*, 427 U.S. 347 (1976) .............................................................................30

*Ezell v. City of Chicago*, 651 F.3d 684, 699 (7th Cir. 2011) ...........................................30, 31, 32

*Freeman v. Corzine,* 629 F.3d 146 (3rd Cir. 2010) ...........................................................6

\* *Heller v. District of Columbia*, 670 F.3d 1244 (D.C. Cir. 2011) ...........................................25, 26

*Heller v. District of Columbia,* 801 F.3d 264 (D.C. Cir. 2015) ...................................................4, 27

*Gordon v. Holder,* 721 F.3d 638 (D.C. Cir. 2013) ...................................................................30, 32

*ISKCON v. Lee,* 505 U.S. 672 (1992) .............................................................................22

*K.A. ex rel. Ayers v. Pocono Mountain Sch. Dist.,* 710 F.3d 99 (3rd Cir. 2013) .........................32

*Lujan v. Defenders of Wild Life,* 504 U.S. 555 (1992) ...........................................................5

*McCullen v. Coakley*, 134 S.Ct. 2518 (2014) ...................................................26, 27, 28, 29

\* *McDonald v. City of Chicago*, 561 U.S. 742 (2010) .............................................1, 3, 13, 21, 26

\* *Moore v. Madigan*, 702 F.3d 933 (7th Cir. 2012) ...................................................22, 28, 33, 34

*Morris v. District of Columbia,* 38 F.Supp.3d 57 (D.D.C. 2014) .................................................33

*NRA v. BATFE,* 700 F.3d 185 (5th Cir. 2012) ...................................................................6

*Palmer v. District of Columbia,* 59 F.Supp.3d 173 (D.D.C. 2014) ...........................................3, 22

\* *Parker v. District of Columbia*, 478 F.3d 370 (D.C. Cir. 2007) ...............................................5, 25

*People v. Aguilar*, 2 N.E.2d 321 (Ill. 2013) ............................................................................23

\* *People v. Yanna,* 297 Mich App. Ct. 137, 824 N.W.2d 241 (2012) ...............................10, 19, 21

*San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1 (1973) ....................................26

*Shelby County v. Holder,* 133 S.Ct. 2612 (2013) ......................................................22

*State v. DeCiccio,* 315 Conn. 79, 105 A.3d 165 (2014) ....................................10, 11, 14

*State v. Delgado,* 298 Ore. 395, 692 P.2d 610 (1984) ................................................11

*State v. Griffin,* 2011 WL 2083893 (Del. Sup. Ct. May 16, 2011) ...............................11

*United States v. Virginia,* 518 U.S. 515 (1996) ...........................................................28

*United States v. Miller,* 307 U.S. 174 (1939) ..............................................................13

*Va. State Bd. Of Pharmacy v. Va. Citizens Consumer Council, Inc.,* 425 U.S. 748 (1976) ...........6

*Winter v. NRDC,* 555 U.S. 7 (2008) ...........................................................................30

### Constitutional Materials, Statutes and Rules

U.S. Const. amend. II ...................................................................................................1, 9

U.S. Code

26 U.S.C. §§ 5801-5872 ...............................................................................................12

26 U.S.C. § 5845(f) ......................................................................................................12

D.C. Code

§ 7-2501.01(7) (D) ................................................................................................3, 7, 12

§ 7-2502.01(a) .................................................................................................................7

§ 7-2502.14 ..................................................................................................................29

Va Code

§18.2-308.1 ..................................................................................................................29

§18.2-308.2 ..................................................................................................................29

Fed. R. Civ. P. 65(a)(2) ...............................................................................................33

*Other Authorities*

Alexis Artwolh, Loren W. Christensen, *Deadly Force Encounters, What Cops Need to Know to Mentally and Physically Prepare for and Survive a Gun Fight* (1997) ............17, 18

Andrew Branca, *The Law of Self-Defense* (2013) ......................................................18

Associated Press, *Cases of Officers Killed by Their Own Guns Likely Will Not Change R.I. Policies* (May 2, 2005), available at https://www.policeone.com/close -quarters-combat/articles/100228-Cases-of-Officers-Killed-by-Their-Own- Guns-Likely-Will-Not-Change-R-I-Policies/ ......................................................17

Bruce Taylor, et al., *Comparing Safety Outcomes in Police Use-of-Force Cases for Law Enforcement Agencies that Have Deployed Conducted Electrical Energy Devices and a Matched Comparison Group that Have Not: A Quasi-Experimental Evaluation,* NIJ MONOGRAPH (2009) ..............................................................9, 14

Charles S. Petty, *Deaths in Police Confrontations When Oleoresin Capsicum is used* (February 2004), available at https://www.ncjrs.gov/pdffiles1/nij/grants/204029.pdf .....14, 15

*Cop shoots himself in the leg*, UTube.com (April 14, 2006), available at https://www.youtube.com/watch?v=am-Qdx6vky0 ............................................15

Cory Shaffer, *CMHA police officer accidentally shot in the leg at Tri-C gun range*, CLEVELAND.COM (May 5, 2016), available at http://www.cleveland.com/metro/ index.ssf/2016/05/cmha_police_officer_accidental_1.html ............................................15, 16

Dennis Tueller, *How Close is Too Close,* SWAT MAGAZINE (March 1983) ................................12

Eugene Volokh, *Nonlethal Self-Defense, (Almost Entirely) Nonlethal Weapons, Weapons and the Rights to Keep and Bear Arms and Defend Life,* 62 STAN. L. REV. 199 (2009) ..........................................................13, 20

Federal Bureau of Investigation, CRIME IN THE UNITED STATES BY STATE: 2014 ......................28

Geoffrey P. Alpert, et al., National Institute of Justice*, Police Use of Force, Tasers and Other And Other Less-Lethal Weapons* (May 2011) ................................................9, 28

http://gundata.org/ballistic-calculator ..........................................................16

John M. McDonald et al., *The Effects Of Less-Lethal Weapons On Injuries In Police Use-Of-Force Events,* Am. J. Public Health 2268 (December 2009) ....................................14

Mark Kroll, Jeffrey D. Ho, eds., *Taser® Conducted Electrical Weapons: Physiology Pathology, and Law* (2009) ........................................................9

iv

Martin Smith, *Gun Injuries Soar As Police 'Experts' Blast Themselves And Colleagues
By Mistake*, Daily Mail (March 16, 2008), available at
http://www.dailymail.co.uk/news/article-535071/Gun-injuries-soar-police-experts-blast-
colleagues-mistake.html ............................................................................................15

Meredith Jorgensen, *Lancaster Officer Accidentally Shoots Self*, WGAL
(February 9, 2016), available at http://www.wgal.com/news/
breaking-lancaster-officer-accidentally-shoots-self/37895650 ...............................15

Nate Rawlings, *Ready Fire, Aim: The Science Behind Police Shooting Bystanders*,
TIME MAGAZINE (September 13, 2013), available at http://nation.time.com/
2013/09/16/ready-fire-aim-the-science-behind-police-shooting-bystanders/ ........16

Patrick Tolbert, *University Of Texas Officer Shot When Gun Goes Off While Holstered*,
KXAN (May 17, 2016), available at http://kxan.com/2016/05/17/officer-hurt-
in-accidental-shooting-on-on-university-of-texas-campus/ ...................................15

Paul H. Robinson, *A Right To Bear Firearms But Not To Use Them? Defensive
Force Rules And The Increasing Effectiveness Of Non-Lethal Weapons*,
89 B.U.L. REV. 251 (2009) ....................................................................................18

*Police Chief Accidentally Shoots Himself For The Second Time*, COUNTERCURRENT NEWS
(January 2, 2015), available at http://countercurrentnews.com/2015/01/police-chief-
accidentally-discharges-for-the-second-time/ .......................................................15

Robert Wilde, *57 Police Officers Fatally Shot by "Unarmed" Suspects Since 2000*,
BREITBART.COM (August 30, 2014), available at http://www.breitbart.com/
california/2014/08/30/57-police-officers-were-fatally-shot-by-unarmed-suspects/ ...............17

Ron Martinelli, *The 21 Foot Rule: Forensic Fact or Police Myth,* Law Officer
(February 12, 2016) ...............................................................................................12

Scott Glover, Matt Laid, *Accidental Gunshots Vex LAPD*, LA TIMES (August 17,
2006), available at http://articles.latimes.com/2006/aug/17/local/me-guns17 .......16

Taser Web Site, https://www.taser.com/lives.saved ....................................................9

Taser Web Site, https://buy.taser.com/taser-state-requirements/ .................................19

William Bozeman, et al., *Safety and Injury Profile of Conducted Electrical Weapons
Used by Law Enforcement Officers Against Criminal Suspects*
53 ANNALS OF EMERGENCY MEDICINE 480 (2009) ................................................8, 13, 14, 28

*\* Indicates principal authorities relied upon*

## *Summary of Argument*

The Second Amendment guarantees that "the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend II.  The Supreme Court has twice affirmed, in *District of Columbia v. Heller,* 554 U.S. 570 (2008) (hereinafter "*Heller")* and *McDonald v. City of Chicago*, 561 U.S. 742 (2010) (hereinafter "*McDonald"*) that the core of the Second Amendment guarantee is the right to keep and bear arms for self-defense.  And the Supreme Court has just this term in its per curium decision in *Caetano v. Massachusetts,* 577 U.S. __, slip op. (March 21, 2016) reiterated that the arms protected by the Second Amendment extend beyond firearms to other weapons commonly used by law-abiding persons for self-defense.

Although the District has reluctantly complied with *Heller* by allowing individuals to "keep" *lethal* firearms in their home for self-defense, and has provided a means for public carry of firearms – albeit extremely restricted and constitutionally suspect – it continues to deny the Second Amendment right of typical, law-abiding citizens to keep and bear a class of commonly used *non-lethal* arms inside and outside the home for self-defense:  Tasers and other electronic arms such as stun guns.  *Heller* resolves this case: The District's laws preventing citizens from owning and employing Tasers and other electronic weapons for self-defense are categorically unconstitutional and inconsistent with the constitutional right to keep and bear arms for self-defense. But even if the Court were to apply one of the "tiers" of heightened constitutional scrutiny, the District's laws would easily fail both strict and intermediate scrutiny.

Plaintiffs need not address the question of the extent the District may regulate electronic arms short of the current outright ban.  What specific regulations the District might adopt must await the political and legislative process, subject of course to the District's obligation to meet the necessary constitutional justification required to impinge on the right to keep and bear a

constitutionally protected article.   Here Plaintiffs seek merely a narrow injunction that would prohibit the District from preventing otherwise law-abiding citizens from possessing and using electronic arms such as Tasers for self-defense.

Plaintiffs are entitled to both preliminary and permanent injunctive relief. Plaintiffs are likely to succeed on the merits as Tasers and other electronic arms are commonly used for self-defense and are not unusually dangerous.  Indeed, such weapons are non-lethal as compared to lethal firearms and knives, lawful to own and carry, subject to regulation, in the District. The other requirements for a preliminary injunction are easily satisfied: the denial of Plaintiffs' constitutional right constitutes irreparable harm, the balance of equities weighs strongly in Plaintiffs' favor, and the continued violation of constitutional rights is never in the public interest. Moreover, unless the District is able to posit a legitimate factual basis sufficient to justify its ban on electronic arms, a permanent injunction is appropriate now because the final outcome of this case does not depend on any facts that may be presented at trial, and because there is no genuine uncertainty about what the outcome of this case will be on the merits.

## *Argument*

## I.   **Introduction.**

The Supreme Court in *Heller*, 554 U.S. 570, and *McDonald,* 561 U.S. 742 (2010), held that the Second Amendment protects the fundamental right of law-abiding persons to keep and bear commonly owned arms for self-defense.  In *Heller* and *McDonald*, the arms in question were handguns.[1]  *Heller* held that the Second Amendment protects a fundamental, individual right to possess firearms for self-defense, and it therefore struck down the District's handgun ban as categorically unconstitutional. 554 U.S. at 628-29 (total handgun ban in the home would fail any standards of scrutiny applied to enumerated constitutional rights).

In *McDonald*, the Court confirmed that the right the Second Amendment protects is fundamental and thus applied *Heller's* ruling to the several states via the 14th Amendment's due process clause to strike down Chicago's handgun ban. 561 U.S. at 750.   Subsequently, in *Palmer v. District of Columbia*, 59 F. Supp. 3d 173 (D.D.C. 2014), this court invalidated a District law that flatly prohibited carrying a firearm outside the home.

This case now presents the question whether the District may ban the possession and carrying of a Taser® electronic control device ("ECD") (also known as a conductive electrical weapon "CEW"), a non-lethal arm commonly used by citizens and police in lieu of deadly force to temporarily incapacitate an attacker, or in the case of law enforcement officers, to aid in apprehending a suspect or gaining compliance.  District of Columbia law outlaws the possession of Tasers and other electronic arms, labeling them as "destructive devices," essentially the same as bombs and poison gas.  *See* D.C. Code § 7-2501.01(7)(D).

---

[1] Heller also invalidated D.C.'s requirement that all guns, including legal shotguns and rifles, be kept either disassembled, or unloaded and trigger-locked, when stored in the home.  *Heller*, 554 U.S. at 630.

Plaintiffs Crystal Wright, Brendan Turner and Traci Dean, all District of Columbia residents, seek to keep and bear Tasers for self-protection in the event of a violent attack. As a direct result of the District of Columbia's ban on the possession, importation and sale of electronic arms, they are denied their right to do so. Accordingly, they seek a preliminary and permanent injunction against enforcement of DC's electronic arms ban.

As shown below, Plaintiffs have standing to challenge DC's ban on Tasers. Likewise, Plaintiffs are entitled to a preliminary injunction against enforcement of this ban. Plaintiffs are likely to prevail on the merits of this action. A Taser is an arm under the Second Amendment. It is a device commonly used for self-defense by law abiding persons. And a Taser is neither an unusually dangerous arm nor is there a longstanding tradition of banning such an arm in the United States. As such, the Second Amendment protects the right of law-abiding persons to keep and carry Tasers for self-protection, necessitating this court to declare DC's ban on Tasers and like arms unconstitutional.

Although the District's ban on electronic weapons must be struck down categorically based *Heller's* precedent, the ban cannot survive any level of enhanced scrutiny. DC cannot posit a legitimate governmental interest sufficient to meet either strict scrutiny or intermediate scrutiny, and any argument based on the alleged "social cost" caused by citizens possessing and using arms is foreclosed by the Second Amendment as the framers made certain. *See Heller v. District of Columbia,* 801 F.3d 264, 279-80 (D.C. Cir. 2015) (hereinafter "*Heller III*").

Plaintiffs are suffering irreparable harm from this ongoing constitutional violation, and both the equities and the public interest weigh strongly in favor of an injunction. The balance of harm overwhelmingly favors Plaintiffs inasmuch as Tasers are a non-lethal arm and are seldom if ever used in crime. Thus, although the District has an obvious interest in reducing violence, that interest is not impacted here where Tasers are not implicated in violence. Finally, the public

interest is always served in vindicating constitutional rights.  Indeed, given that this case presents

only legal issues and given that Plaintiffs plainly are entitled to prevail, this court should enter

final judgment permanently enjoining the District from enforcing its unconstitutional laws.

## II.    Plaintiffs have standing to bring this action.

To show standing, Plaintiffs must allege a concrete and particularized injury that is either

actual or imminent. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). That injury must be

both fairly traceable to the challenged action of the defendant and redressable by the court. *Id*. at

560-61.  Plaintiffs plainly meet this standard.

Plaintiffs here are suffering an immediate and continuing injury because the District denies

them the ability to acquire, possess and use a Taser in the District of Columbia for personal self-

defense.  There was a similar injury sufficient for standing in *Parker v. District of Columbia*, 478

F.3d 370, 376 (2007), *aff'd sub nom. Hell*er, 554 U.S. 570. Likewise, there was an almost identical

injury in *Dearth v. Holder*, 641 F.3d 499 (D.C. Cir. 2011).  There the D. C. Circuit said

> We agree with Dearth that the Government has denied him the ability to purchase
> a firearm and he thereby suffers an ongoing injury. Dearth's injury is indeed like
> that of the plaintiff in *Parker*, who had standing to challenge the District of
> Columbia's ban on handguns because he had been "denied a registration certificate
> to own a handgun." 478 F.3d at 376. As we there stated, "a license or permit denial
> pursuant to a state or federal administrative scheme" that can "trench upon
> constitutionally protected interests" gives rise to "an Article III injury"; "the formal
> process of application and denial, however routine," suffices to show a cognizable
> injury.

Id. at 502.

Significantly in *Dearth*, the Government argued that *Parker* did not control because the

government itself did not affirmatively deny Mr. Dearth's application to purchase a firearm. *Id.*

The Court of Appeals rejected that claim and held, "the Government cannot so easily avoid suit

when it has erected a regulatory scheme that precludes Dearth from truthfully completing the application form the Government requires for the purchase of a firearm.  Like Dick Heller in the *Parker* case, Mr. Dearth twice attempted to go through the 'formal process' of applying to purchase a firearm and each time failed because of the laws and regulations he now challenges." *Id.*

Plaintiffs here went through the formal process of applying to buy a Taser and were denied by Taser International on the basis that Plaintiffs' purchase of the Tasers would place both Taser International and the Plaintiffs in violation of District law.  *See* Exhibit 1, hereto, Declaration of Crystal Wright at para. 13; Exhibit 2, hereto, Declaration of Traci Dean, at para. 12; Exhibit 3, hereto, Declaration of Brendan Turner, at para. 14. Thus, Plaintiffs suffer a concrete and continuing injury as a result of the challenged statute.  *See Va. State Bd. Of Pharmacy v. Va. Citizens Consumer Council, Inc.,* 425 U.S. 748, 750-57, 755 n.12 (1976) (consumers had standing to challenge constitutionality of state statute prohibiting pharmacists from advertising prescription drug prices); *NRA v. BATFE,* 700 F.3d 185, 190-91 (5th Cir. 2012) (18-20 year-olds had standing to challenge federal ban on purchase of a handgun by persons under 21).  *See also Freeman v. Corzine,* 629 F.3d 146 (3rd Cir. 2010) (consumers had standing to challenge prohibition against interstate shipment of wine directly to consumers).  *Accord Bridenbaugh v. Freeman-Wilson*, 227 F.3d 848, 849-50 (7th Cir. 2000). Inasmuch as the requested relief herein would redress Plaintiffs' injury by allowing them to acquire and use Tasers for self-defense, Plaintiffs have standing to bring this action.[2]

---

[2] The District cannot suggest that the law against possession of an electronic self-defense device is not enforced.  *See District of Columbia v. Terrell,* Crim. No. 2015 CTF 1919 (Defendant charged with possession of destructive device, i.e., stun gun).

**III.    Plaintiffs are entitled to a preliminary injunction.**

The court evaluates a request for a preliminary injunction by looking at four factors.  "A plaintiff seeking a preliminary injunction must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Aamer v. Obama*, 742 F.3d 1023, 1038 (D.C. Cir. 2014) (quotation marks omitted). Each of these factors supports Plaintiffs' motion for a preliminary injunction.

**IV.    Plaintiffs are likely to prevail on the merits of their claim that the District's ban on Tasers and other electronic defensive arms violates the Second Amendment.**

Plaintiffs are likely to prevail on the merits of this action because the District bars responsible, law-abiding persons from keeping and bearing a class of commonly used arms even in the home for self-defense that are not unusually dangerous.

**a.   The District of Columbia bans otherwise law-abiding residents from keeping and bearing Tasers and other electronic arms.**

D.C. Code § 7-2502.01(a) provides with exceptions not pertinent to Plaintiffs, that "no person or organization in the District of Columbia shall receive, possess, control, transfer, offer for sale, sell, give, or deliver any destructive device."  D.C. Code § 7-2501.01(7)(D), in turn, defines "destructive device" inter alia as, "Any device designed or redesigned, made or remade, or readily converted or restored, and intended to stun or disable a person by means of electric shock."  These two provisions serve to outlaw the possession and use of Tasers and other electronic arms such as stun guns, even in the home where it is undisputed in this circuit that Second Amendment rights are at their zenith.  *See Dearth v. Holder,* 791 F.3d 32, 40-42 (2015) (Henderson, J., dissenting).

A Taser is an electroshock arm sold by Taser International, Inc. It fires two small dart-like electrodes via compressed nitrogen gas, which stay connected to the main unit by thin wire conductors, to deliver a low amperage electric current to disrupt voluntary control of muscles. Exhibit 4, Declaration of Mark Kroll, para. 13.   A person exposed to a Taser deployment experiences stimulation of sensory and motor nerves, resulting in involuntary muscle contractions. *Id.* at paras. 11-15; Exhibit 5**,** William Bozeman, et al., *Safety and Injury Profile of Conducted Electrical Weapons Used by Law Enforcement Officers Against Criminal Suspects,* 53 ANNALS OF EMERGENCY MEDICINE 480, 481 (2009).   Tasers, unlike stun guns, do not rely on pain compliance, except when used in "drive stun" mode, and are thus preferred by law enforcement over non-Taser stun guns and other electronic control weapons. Exhibit 4 at paras. 4, 7-11. *See also* Exhibit 5, Bozeman at 481.   Law enforcement models have ranges up to 35 feet (11 meters). Exhibit 4 at para. 13.   Civilian versions of the device have a maximum range of 15 feet (5 meters). *Id.*

To deter misuse of the devices, Taser maintains a registry of civilian purchasers of Tasers and Taser cartridges. Exhibit 4 at para 34. When the civilian model of the device is deployed the device releases numerous small ID tags containing information that allows police to trace the purchaser of the device. *Id.*

Tasers were introduced as non-lethal weapons for police to use to subdue fleeing, belligerent, or potentially dangerous persons, who would have otherwise potentially been subjected to lethal weapons such as firearms or other more control techniques more likely to cause physical injury. *See* Exhibit 4, paras. 7-11. A 2009 Police Executive Research Forum study said that officer injuries dropped by 76 percent when a Taser is used.  Bruce Taylor, et al., *Comparing Safety Outcomes in Police Use-of-Force Cases for Law Enforcement Agencies that Have Deployed*

8

*Conducted Energy Devices and a Matched Comparison Group that Have Not: A Quasi-Experimental Evaluation,* NIJ MONOGRAPH (2009). Taser's web site as of April 4, 2016 states that Taser deployment has saved 164,069 persons from death or serious bodily harm.   *See* https://www.taser.com/lives-saved.  The United States Department of Justice has found that Taser use by police reduce serious injuries to both suspects and officers.  Geoffrey P. Alpert, *Police Use of Force, Tasers and Other Less-Lethal Weapons*, NIJ RESEARCH IN BRIEF, (May 2011), at 14, available at https://www.ncjrs.gov/pdffiles1/nij/232215.pdf (Exhibit 6, hereto).  *See also* Mark Kroll, Jeffrey D. Ho (eds.), *Taser® Conducted Electrical Weapons: Physiology, Pathology, and Law* (2009), E. Brewer, Mark W. Kroll, Chapter 24, 287-289 (Exhibit 7, hereto).  Taser International has sold 850,000 Tasers to some 18,000 law enforcement, security and military agencies in the United States.  Exhibit 4, para. 5. Taser has sold some 275,000 Tasers to civilians since entering the civilian market in 1994.  *Id.*  Tasers are in use in 107 countries.  *Id.*

### b.  Tasers are arms under the Second Amendment.

The Second Amendment to the United States Constitution protects the "right to keep and bear *arms*," not just the right to keep and bear *firearms*.  U.S. Const., amend. II (emphasis added). The Supreme Court and the courts of other states have treated the right as extending beyond firearms. The Supreme Court recently made this clear in unanimously reversing the holding of the Massachusetts Supreme Judicial Court in *Caetano v. Massachusetts*, 577 U.S. ___, slip op. (March 21, 2016).  The Massachusetts court had held that stun guns were not protected arms because they were not in common use when the Second Amendment was enacted. *Caetano*, slip op. at 1. In addition, the Massachusetts court said stun guns were not protected because the record was lacking in evidence that stun guns were readily adapted to military use. *Caetono*, slip. op. at 2.  The Supreme Court said, however, that it "has held that 'the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time

of the founding.' *District of Columbia v. Heller*, 554 U.S. 570, 582 (2008)." *Id.,* slip op. at 1.  The

*Caetono* opinion also rejected the "proposition 'that only those weapons useful in warfare are

protected.'" *Id.* slip op. at 2, citing 554 U.S. at 624-25.

> In fact, the Court in *Heller* stated,

> The 18th-century meaning [of arm"] is no different from the meaning today. The 1773 edition of Samuel Johnson's dictionary defined "arms" as "weapons of offence, or armour of defence." 1 Dictionary of the English Language 107 (4th ed.) (hereinafter Johnson). Timothy Cunningham's important 1771 legal dictionary defined "arms" as "any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another." 1 A New and Complete Law Dictionary (1771); see also N. Webster, American Dictionary of the English Language (1828) (reprinted 1989) (hereinafter Webster) (similar).

> The term was applied, then as now, to weapons that were not specifically designed for military use and were not employed in a military capacity. For instance, Cunningham's legal dictionary gave as an example of usage: "Servants and labourers shall use bows and arrows on *Sundays*, &c. and not bear other arms."

*Heller*, 554 U.S. at 581.

So just like the handgun in *Heller*, a Taser or a stun gun is designed to be borne "for . . .

defence, or . . . to cast at or strike another." *Id*.  The District, however, criminalizes an entire class

of "arms" falling squarely within the plain wording used by the Framers.  Plainly, Tasers

"constitute bearable arms" for purposes of Second Amendment analysis.  In *People v. Yanna*, 297

Mich. App. 137, 140, 824 N.W.2d 241, 243 (2012) the court struck down Michigan's statute

criminalizing possession of electronic weapons, stating that following *Heller*, the Second

Amendment "protect[s] a citizen's right to possess and carry Tasers or stun guns for self-defense,

and the state may not completely prohibit their use by private citizens."

In a similar case, *State v. DeCiccio*, 315 Conn. 79, 108-150, 105 A.3d 165, 185-210 (2014),

the Connecticut Supreme Court read *Heller* to invalidate a Connecticut statute on Second

Amendment grounds criminalizing the transport of dirk knives and police batons in a motor

vehicle. Various other state courts have found arms other than firearms protected under the Second Amendment.  *See State v. Griffin*, 2011 WL 2083893, *7 n.62 (Del. Super. Ct., May 16, 2011) (holding that "arms" encompasses "all instruments that constitute bearable arms" and therefore a "knife, even if a 'steak' knife, appears to be a 'bearable arm' that could be utilized for offensive or defensive purposes," and is protected under both the Second Amendment and the Delaware Constitution); *City of Akron v. Rasdan*, 663 N.E.2d 947, 951-52 (Ohio Ct. App. 1995) (treating a restriction on knife possession as implicating the "right to keep and bear arms" under the Ohio Constitution, though concluding that the restriction is constitutional because "[t]he city of Akron properly considered this fundamental right by including in [the knife restriction] an exception from criminal liability when a person is 'engaged in a lawful business, calling, employment, or occupation' and the circumstances justify 'a prudent man in possessing such a weapon for the defense of his person or family'"); *State v. Delgado*, 692 P.2d 610, 610-14 (Or. 1984) (holding that the "right to keep and bear arms" under the Oregon Constitution extends to switch blade knives because they could be used for defensive purposes). Although various cases differ on just which weapons can constitute "arms," after *Heller* and *Caetono* it is not plausible to read "arms" as limited to guns.

Tasers were of course not in common use at the Second Amendment's enactment because they did not even exist until modern times. But the Supreme Court "do[es] not interpret constitutional rights that way." *Heller*, 554 U.S. at 582. *See Caetono,* slip op. at 1.   Although Tasers did not exist in 1789, other portable self-defense weapons less lethal than firearms, such as knives and billy clubs, were in common use at the founding. *See State v. DeCiccio*, 315 Conn. at 117-118, 105 A.3d at 190-191. And, like the modern handgun at issue in *Heller*, a Taser may be kept in a location (such as a purse or a holster) "that is readily accessible in an emergency," and

11

that may be utilized by "those without the upper-body strength to lift and aim" a heavier weapon. *Heller*, 554 U.S. at 629. Tasers thus share many of the features that make handguns so popular as self-defense arms, but with one important exception highly relevant to this case: they are not a lethal weapon and are thus much less dangerous than handguns.[3]  The conclusion that Taser's are arms under the Second Amendment is thus manifest.

### c.   Tasers are neither dangerous nor unusual.

District law classifies Tasers and stun guns in the same class as bombs, poison gas, and heavy weapons: as "destructive devices." D.C. Code § 7-2501.01(7).  That classification is plainly irrational and in any event cannot serve as a basis for banning electronic arms.  The term destructive device owes its origin to the National Firearms Act of 1934 ("NFA").  26 U.S.C. §§ 5801-5872. In most states, such items as grenades, bombs, and heavy weapons are legal to possess only upon the issuance of a special tax stamp, federal registration and a comprehensive background check by the Bureau of Alcohol, Tobacco, Firearms and Explosives.  *See* 26 U.S.C. § 5845(f) (defining destructive devices).  This is because they are in fact the very types of dangerous and unusual weapons referred to in *Heller,* possessing enormous destructive power.  *See Heller,* 554 U.S. at 627.  No Federal court to Plaintiffs' knowledge has held that possession of destructive devices or

---

[3] A significant advantage of a Taser, as opposed to a knife or billy club, is that the Taser is designed to be a standoff weapon to be used before an assailant can come within arm's reach of a victim. The chance of death or serious bodily harm to a victim is substantially increased if the attacker can close to contact distance.  The assailant could have a contact weapon such as a knife or club, or the assailant may be bigger and stronger than the intended victim such that he may easily overpower her.  A Taser could be deployed beyond the wingspan of the victim and assailant alike. The importance of distance in keeping one safe in a potentially violent attack is aptly illustrated by the standard training of police officers.  Police officers are regularly trained that escalation to deadly force is appropriate when a suspect armed with a knife or club exhibiting signs of an attack closes within seven yards of the officer.  *See* Dennis Tueller, *How Close is Too Close,* SWAT Magazine (March 1983).  *See also* Ron Martinelli, *The 21 Foot Rule:  Forensic Fact or Police Myth*, Law Officer (Feb. 12, 2016) available at http://lawofficer.com/2016/02/21footrule/; Exhibit 4, Kroll Declaration, para. 29.

other NFA weapons is a Second Amendment right.  *But see United States v. Miller*, 307 U.S. 174, 178 (1939) (absent a showing that a sawed-off shotgun had utility for the preservation of the militia, we cannot say that the Second Amendment guarantees the right to keep and bear such an instrument.")  Although D.C. constitutionally may be able to ban true destructive devices, such as those covered by the NFA, it cannot simply classify any arm as a destructive device and ban it as dangerous and unusual, when it demonstrably is not.

For an arm to be prohibited under the Second Amendment, it must be both unusual and dangerous.  *Heller,* 554 U.S. at 627.  Tasers are neither.  It is difficult to comprehend how a Taser, a weapon designed not to kill or maim and is "almost never fatal," (Volokh, *Nonlethal Self-Defense, (Almost Entirely), Nonlethal Weapons, and the Right to Keep and Bear Arms and Defend Life*, 62 STAN. L. REV. 199, 204 (2009)), if ever, could be banned in accord with *Heller* as a "dangerous and unusual weapon" when *Heller* plainly protects a very deadly weapon:  handguns. As Justice Breyer pointed out in dissent, handguns, are employed in "well over 60,000 deaths and injuries in the United States each year," *McDonald v. City of Chicago*, 561 U.S. at 924, but are nevertheless the "quintessential self-defense weapon" for Second Amendment purposes. *Heller*, 554 U.S. at 629.

As the Declaration of Mr. Kroll explains, there have been some five million Taser exposures and no documented case of a Taser causing electrocution.  *See* Exhibit 4 at para. 28. *See also* Exhibit 8, Declaration of Michael A. Brave, a Master Taser Instructor, para. 12 ("I have never witnessed a significant injury in the course of training instructors or end users.")  Police officers regularly undergo a Taser exposure in the course of training.  Exhibit 4, para. 32; Exhibit 8, para. 12.  Where injuries do result from a Taser exposure, they usually result from a fall to the ground and are usually minor.  Exhibit 4, at para. 32.  *See generally* Exhibit 5, Bozeman, *Safety and Injury*

*Profile of Conducted Electrical Weapons Used by Law Enforcment Officers Against Criminal Suspects*.  In fact, Tasers used in law enforcement are credited with reducing injuries to suspects and officers.  *See* John M. McDonald et al., *The Effect of Less-Lethal Weapons on Injuries in Police Use-of-Force Events*, AM. J. PUBLIC HEALTH 2268 (December 2009); Taylor, *Comparing Safety Outcomes in Police Use-of-Force Cases for Law Enforcement Agencies that Have Deployed Conducted Energy Devices and a Matched Comparison Group that Have Not: A Quasi-Experimental Evaluation*.  *See also State v. DeCiccio*, 315 Conn. at 121, 105 A.3d at 193 (the more limited lethality of dirk knives compared to firearms provides strong support for the conclusion that dirk knives also are entitled to protected status under the Second Amendment).

Absolutely no basis exists to presume that Tasers in the hands of law-abiding citizens would be any more dangerous than in the hands of law enforcement.  Indeed, citizens would have far fewer uses for Tasers than do police.  For law enforcement, Tasers are principally employed for two reasons:  one, to gain compliance from uncooperative or resisting suspects; second, for defense of the officer or an innocent third party.  Only for this second reason would a citizen have legal justification to employ a Taser or other electronic defense tool.  Just as in the case of a law enforcement application, the chance of serious injury to the attacker would be minimal and certainly far less likely than if the victim responded with personal weapons (hands, feet, elbows or knees), a contact weapon such as a club or a knife, or a firearm.

Even self-defense sprays, such as pepper spray or Mace®, present their own risks.  There have been cases of subjects dying after being pepper sprayed by law enforcement officers; generally, these subjects have respiratory issues such as asthma, serious heart problems, or substantial amounts of simulative drugs in their systems.  *See* Charles S. Petty, *Deaths in Police Confrontations When Oleoresin Capsicum is Used* (Feb. 2004), available at

https://www.ncjrs.gov/pdffiles1/nij/grants/204029.pdf.  No such deaths have been attributable to Tasers even when employed on persons with cardiac issues.[4]

Unlike Tasers, any of the above arms also pose a serious risk to the innocent victims of an attack.  Engaging in a fist fight with an attacker carries substantial risk of serious injury or death especially if there is a disparity in the size and weight of the attacker versus the innocent victim. Likewise, use of a contact weapon requires that the attacker and victim be within touching distance of one another.  And although a firearm is best employed as a standoff weapon, using a firearm for self-defense poses five significant dangers among a multitude of risks to the victim and other innocents not presented by use of Tasers.

First, simply accessing the firearm under the stress of imminent attack itself carries a risk of a self-inflicted injury, an occurrence that has happened to far too many law-enforcement officers; indeed, often even without the stress of a violent confrontation.[5]  The risk of a self-inflicted Taser exposure is far less serious, than a self-inflicted gunshot wound.

---

[4] To be sure, there have been some in custody deaths of suspects who were exposed to one or more Taser shots.  However, those deaths are almost always accompanied by an extended physical altercation with law enforcement officers and/or large ingestion of dangerous drugs such as cocaine, PCP or "bath salts."  Tasers have not been shown to have been a contributing factor to the deaths.  *See* Exhibit 4 at para. 28.

[5] *See e.g.,* Martin Smith, , *Gun Injuries Soar As Police 'Experts' Blast Themselves And Colleagues By Mistake,* DAILY MAIL (March 16, 2008), available at http://www.dailymail.co.uk/news/article-535071/Gun-injuries-soar-police-experts-blast-colleagues-mistake.html; Patrick Tolbert, *University of Texas Officer Shot When Gun Goes Off While Holstered*, KXAN (May 17, 2016), available at http://kxan.com/2016/05/17/officer-hurt-in-accidental-shooting-on-on-university-of-texas-campus/; *Police Chief Accidentally Shoots Himself For The Second Time,* COUNTERCURRENT NEWS (January 2, 2015), available at http://countercurrentnews.com/2015/01/police-chief-accidentally-discharges-for-the-second-time/; *Cop Shoots Himself In The Leg,* UTUBE.COM (April 14, 2006), available at https://www.youtube.com/watch?v=am-Qdx6vky0; Meredith Jogensen, *Lancaster Officer Accidentally Shoots Self,* WGAL (February 9, 2016), available at http://www.wgal.com/news/breaking-lancaster-officer-accidentally-shoots-self/37895650; Cory Shaffer, *CMHA Police Officer Accidentally Shot In The Leg At Tri-C Gun Range,*

Second, using a firearm in self-defense requires care to avoid placing innocent persons at risk.  When police shoot, they often miss their target with more rounds than they hit.  For example, a Rand Corporation study of the New York City Police Department performance from 1998 to 2006 indicated that New York police involved in gun fights had hit rates on suspects of only 18 percent; that rose to 30 percent when the suspect was not shooting back.[6]  One would hope that police on average are better trained with their firearms than the average citizen.[7]  Risk of hitting an innocent person is far lower with a Taser than with a firearm.  The civilian Taser models have ranges of only 15 yards.  A handgun bullet could be deadly hundreds of yards away, although in an urban environment such as DC it is likely that the bullet would hit something or someone well before traveling even 50 yards.[8]  A missed Taser shot is thus demonstrably less likely to hit an innocent person than a missed gun shot and if it does, a Taser strike is much less likely to cause significant injury.

Third, there is always the potential of having the firearm taken away and used on the victim.  Again, the experience of police officers tells us weapons' retention is a serious issue in use of a

---

CLEVELAND.COM              (May              5,              2016),              available              at http://www.cleveland.com/metro/index.ssf/2016/05/cmha_police_officer_accidental_1.html.

[6] Nate Rawlings, *Ready Fire, Aim:  The Science Behind Police Shooting Bystanders*, TIME MAGAZINE (September 13, 2013), available at http://nation.time.com/2013/09/16/ready-fire-aim-the-science-behind-police-shooting-bystanders/.  *See also*, Scott Glover, Matt Laid, *Accidental Gunshots    Vex    LAPD*,    LA    Times    (August    17,    2006),    available    at http://articles.latimes.com/2006/aug/17/local/me-guns17.

[7] *See* Exhibit 8, para. 18, where Master Taser Instructor Michael Brave explains based on his experience that it is easier to train a person to use a Taser than a handgun.

[8] For the typical 9 mm handgun cartridge carried by DC police officers, the bullet leaves the gun muzzle at approximately 1200 feet per second.  At 250 yards, the round is still traveling approximately 830 feet per second having lost only 1/3 of its velocity, and will have dropped less than six feet.  *See http://gundata.org/ballistic-calculator/*  (input data:  124 grain Speer Gold Dot hollow point with no atmospheric correction).  That bullet is still potentially deadly.

16

firearm for self-defense.[9]   The ramifications to the victim of a Taser being wrestled away from a victim are obviously substantially less serious than if the victim has her firearm taken away.

Fourth, the aftermath of using a firearm or other means of deadly force is likely to have serious adverse psychological ramifications to the victim.   The emotional injuries suffered by persons undergoing a deadly force encounter are well known in police training literature.[10]  In the immediate aftermath of the event, several physical reactions are common, including trembling, sweating, chills, nausea, diarrhea, dizziness, hyperventilation, jumpiness and extreme thirst.[11] Although disconcerting, these physical issues are likely to pass within 24 hours.  Various emotional states often accompany these physical reactions, including, a wide range of emotions such as bouts of crying, elation, anger, paranoia, despondency, emotional numbness, alienation, confusion, difficulty concentrating and impaired memory.[12]   These symptoms can persist for several days.[13] Additional manifestations of emotional harm, however, may persist for months and develop into post-traumatic stress disorder ("PTSD").   Whether or not PTSD develops, sleeplessness, appetite disturbance, nightmares, relationship issues, sexual dysfunction, substance abuse, social isolation,

---

[9] *See* Associated Press, *Cases of Officers Killed by Their Own Guns Likely Will Not Change R.I. Policies* (May 2, 2005), available at https://www.policeone.com/close-quarters-combat/articles/100228-Cases-of-Officers-Killed-by-Their-Own-Guns-Likely-Will-Not-Change-R-I-Policies/;  Robert Wilde, *57 Police Officers Fatally Shot by "Unarmed" Suspects Since 2000,* BREITBART.COM (August 30, 2014), available at http://www.breitbart.com/california/2014/08/30/57-police-officers-were-fatally-shot-by-unarmed-suspects/.

[10] *See* Alexis Artwohl, Loren W. Christensen, *Deadly Force Encounters, What Cops Need to Know to Mentally and Physically Prepare for and Survive a Gunfight* (1997).

[11] *Id.,* at 180.

[12] *Id.,* at 180-81.

[13] *Id.,* at 181.

poor job performance, depression, anxiety, hypervigilance, and increased risk taking behavior are all potential issues that may arise from taking another human life no matter how justified the use of deadly force may have been.[14]  If the victim can end the threat without resort to deadly force, for example, by use of an intermediate weapon such as a Taser, it stands to reason that he or she is more likely to avoid these long term traumatic effects.

Fifth, in the split second of a violent confrontation, there is always the risk of the victim applying excessive force with the attendant criminal and civil legal ramifications.  Availability of a Taser or other electronic defense tool in appropriate situations to crime victims would minimize the potential of the victim employing excessive force in his or her defense with the attendant risk of criminal or civil liability.

The law of self-defense is a careful balancing of harms, especially as it contemplates the use of deadly force in self-defense.  To justify the use of force for self-defense, five interrelated elements must generally be present:  innocence, imminence, avoidance, reasonableness and proportionality.  *See generally* Andrew Branca, *Law of Self-Defense* (2013); Paul H. Robinson, *A Right To Bear Firearms But Not To Use Them? Defensive Force Rules and The Increasing Effectiveness Of Non-Lethal Weapons,* 89 B.U.L. Rev. 251 (2009).

A person using deadly force must be an *innocent* party, i.e., he did not start the fight or initiate the attack. The person acting in self-defense must have been in *imminent* jeopardy of harm, i.e., the risk of harm exists right now.  The person must have used *reasonable* efforts to *avoid* the conflict. For example, in some jurisdictions such as Maryland, the victim has a duty to retreat to the extent she *reasonably* can prior to using force.  And the person acting in self-defense must not have used more force than reasonably necessary to stop the threat, i.e., her use of force must have

---

[14] *Id.,* at 182-85.

been *proportional* to the threat or force used or threatened against her.  The criminal and civil justice systems often take years to judge actions taken in self-defense in seconds.  The potential for a judge or jury in a safe environment months or years later to second guess actions taken by an innocent victim when gripped by fear of death or serious bodily harm is substantial.  Innocent persons have gone to jail or been bankrupted from the cost of defending themselves from criminal and civil liability. This is one reason for the popularity of non-lethal arms.

Thus, far from being dangerous, Tasers in the hands of citizens, just as in the hands of police, reduce injuries to both criminal attackers and to their victims.  Moreover, Tasers have the added advantage of helping to protect the emotional health of potential victims of crime as well as helping to protect them from serious criminal and civil liability.  Far from being the type of dangerous (and unusual) weapon which *Heller* contemplated may be banned, *see* 554 U.S. at 627, a Taser presents substantially less risk to all parties than other common weapons, including firearms, knives, pepper spray, and personal weapons.  The conclusion that Tasers are not so dangerous as can be banned under the Second Amendment is thus manifest.

Nor are Tasers or other electronic arms such as stun guns unusual.  The Supreme Court has already rejected the view that Tasers are unusual because they are a modern invention.  *Caetano,* slip op. at 2.  Use of electronic control weapons is widespread in the United States.  Tasers and stun guns are legal in most states, *see People v. Yanna*, 297 Mich. App. at 144, 824 N.W.2d at 245, and "[h]undreds of thousands of (them) have been sold to private citizens, with many more in use by law enforcement officers." *Id.*[15]  *See* Exhibit 4 at para. 5 (275, 000 sold to civilians and 850,000

---

[15] Besides DC, Tasers and stun guns currently are restricted only in the states of New Jersey, New York, Hawaii, Rhode Island, Massachusetts and in a number of municipalities. *See* Taser web site*, https://buy.taser.com/taser-state-requirements/.*

sold worldwide).  *See also* Volokh, *Nonlethal Self-Defense*, 62 STAN. L. REV. at 200, 244 (listing the District as one of the few jurisdictions that outlaw the possession of Tasers and stun guns by law-abiding citizens).  With some 18,000 law enforcement agencies using the device, and some 275,000 Tasers in the hands of citizens, the device can hardly be considered unusual.  Exhibit 4 at para. 5.[16]

In any event, *Heller* used the term "unusual" in the conjunctive with "dangerous."  554 U.S. at 627. This makes perfect sense.  All weapons are "dangerous" to some degree, the reference to "dangerous . . . weapons" must mean weapons that are more dangerous than the norm — logically meaning weapons that are unusually dangerous.   Thus to uphold DC's ban on possession and carry of Tasers (or stun guns for that matter) this court would have to find that the devices are both dangerous and unusual.  Whatever else might fall under that description, Tasers and stun guns are not unusually dangerous weapons.  They are significantly less deadly than firearms, which are constitutionally protected and allowed in DC, though heavily regulated.  They are less dangerous even than knives, clubs, baseball bats, or bare hands and fists.  *See Caldwell v. Moore*, 968 F.2d 595, 602 (6th Cir. 1992) ("It is not unreasonable for the jail officials to conclude that the use of a stun gun is less dangerous for all involved than a hand to hand confrontation").   Tasers are not unusually dangerous.

   **d.  That the District allows possession of other arms does not justify its ban on Tasers and other electronic defensive arms.**

*Heller* speaks mostly about guns because the plaintiff in *Heller* challenged an absolute ban on handguns.  The Court in *Heller* concluded that the Second Amendment codifies a preexisting

---

[16] Good data appear not to exist for the number of stun guns sold in the United States as opposed to Tasers.  Given their modest cost compared to a Taser, however, it is reasonable to conclude that the number of stun guns is many times the number of Tasers.

"individual right to possess and carry *weapons* in case of confrontation."  *Id.* at 592 (emphasis added).  And in *Caetano,* the unanimous Court made clear that the Second Amendment extends to all bearable arms, which plainly encompasses Tasers and other electronic defense tools.  Slip op. at 1.  Because the DC ban significantly burdens citizens' rights to keep and bear the arms they seek to use for self-defense, it violates the Second Amendment.  *People v. Yanna*, 824 N.W.2d at 246 (holding that stun guns constitute protected arms and overturning Michigan's complete ban as violating the Second Amendment).

> **e.   This court need not reach the question whether a narrower restriction might be constitutional.**

While Plaintiffs believe the right to keep and bear electronic weapons extends outside the home, this Court need not reach that question in this case.  DC's statutory scheme is a categorical ban on all possession of Tasers and stun guns and as such is unconstitutional.  Whether a ban on carrying Tasers and stun guns in public would be constitutional, must await the enactment of such a law.

Thus, this case does not raise the question whether the District could limit the ability to carry a Taser in public.  It is noteworthy, however, that the Second Amendment "guarantee[s] the individual right to possess and carry weapons in case of confrontation."  *Heller*, 554 U.S. at 592 (emphasis added). "Individual self-defense is 'the central component' of the Second Amendment" itself. *McDonald*, 561 U.S. at 767, quoting *Heller*, 554 U.S. at 599. Although the "need" for self-defense may be "most acute" inside the home, *Heller*, 554 U.S. at 628, it cannot be that the right itself simply evaporates at the threshold. Confrontations are not limited to the home. As Judge Posner pointed out:

> A woman who is being stalked or has obtained a protective order against a violent ex-husband is more vulnerable to being attacked while walking to or from her home than when inside. She has a stronger self-defense claim to be allowed to [bear arms]

in public than the resident of a fancy apartment building (complete with doorman) has a claim to sleep with a loaded gun under her mattress.

*Moore v. Madigan*, 702 F.3d 933, 937 (7th Cir. 2012).   *Accord Palmer v. District of Columbia*,

59 F.Supp.3d 173 (District's absolute prohibition on carrying a handgun for personal protection

violates Second Amendment).   And the stun gun used by the defendant in *Caetano* was used in

public, not in the defendant's home.   *Caetano*, slip op. at 1 (concurring opinion of Alito, J.).   If

there was no right to carry the arm outside the home, the case could have been disposed on that

basis.

The Supreme Court's decision in *Cohen v. California*, 403 U.S. 15 (1971), offers a helpful

analogy. In *Cohen*, a defendant was convicted for disorderly conduct because he wore a jacket

bearing a vulgarity. The defendant wore the jacket into a courthouse, and the opinion noted that

such speech might be prohibitable by a rule targeted solely to courthouses. *Id*. at 19. *See also*

*ISKCON v. Lee*, 505 U.S. 672, 679 (1992) (holding that speech in nonpublic fora may be restricted

through reasonable viewpoint-neutral rules). But *Cohen* nonetheless held that

> [a]ny attempt to support this conviction on the ground that the [disorderly conduct] statute seeks to preserve an appropriately decorous atmosphere in the courthouse where Cohen was arrested must fail in the absence of any language in the statute that would have put appellant on notice that certain kinds of otherwise permissible speech or conduct would nevertheless, under California law, not be tolerated in certain places.

403 U.S. at 19. Likewise, any attempt to support this prohibition on the ground that the bans would

only apply in public must fail because Plaintiffs are effectively prohibited from even purchasing a

Taser as a result of vendors' fear of prosecution if they sell to a DC resident.   *Cf. Shelby County v.*

*Holder*, 133 S. Ct. 2612, 2629-30 (2013) (holding that jurisdiction could challenge formula that

subjected it to preclearance requirement under Voting Rights Act.)   *See also* the discussion in

Section II concerning the standing of Plaintiffs.

22

In *People v. Aguilar*, 2 N.E.3d 321 (Ill. 2013), the Illinois Supreme Court struck down a law that broadly banned a firearm carry, and left it to the Legislature to decide what narrower laws might be permitted.  The Illinois Supreme Court's underlying analysis applies here. The court held,

> Of course, in concluding that the second amendment protects the right to possess and use a firearm for self-defense outside the home, we are in no way saying that such a right is unlimited or is not subject to meaningful regulation. That said, we cannot escape the reality that, in this case, we are dealing not with a reasonable regulation but with a comprehensive ban. . .

> Accordingly, . . . we here hold that, on its face, the [statute] violates the right to keep and bear arms, as guaranteed by the second amendment to the United States Constitution.

*Id.* at 327. Likewise, this Court should hold that the total electronic arms ban on its face violates the right to keep and bear arms, even if a reasonable regulation rather than a complete ban might be constitutional.

To be clear, Plaintiffs *are not* seeking an unfettered right to bear electronic arms free from any District regulation or oversight. Plaintiffs only challenge the District's absolute ban on possession and use of a class of arms typically used by law abiding citizens for self-defense.  *See Heller,* 554 U.S. at 628.

**f.    The District's ban fails any measure of heightened constitutional scrutiny.**

Heller interprets the Second Amendment as "elevat[ingl above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home," *Heller*, 554 U.S. at 635, "where the need for defense of self, family, and property is most acute." Inasmuch as the District outlaws possession of Tasers by responsible, law abiding citizens for all purposes, including for home defense, the District's ban on Tasers is plainly facially unconstitutional.

As discussed above, this case presents the question whether the Second Amendments permits DC to prohibit the mere possession of a Taser or stun gun, not whether Taser or stun gun

ownership and use may be regulated in light of compelling state interests. Because the statutory scheme in question prohibits a class of arms entirely, the approach taken by the DC would afford the plaintiffs no Second Amendment protection even for possession of the device in the home.  For this reason, the statute in question cannot survive anything more than "rational-basis scrutiny," if that.  *Heller*, 554 U.S. at 628 n.27. The ban is not narrowly tailored to achieving any legitimate governmental interest.  The ban sweeps broadly to prevent law-abiding persons from using the devices in any circumstances for legal self-defense.  There is no close means ends fit to the ban.  So it can neither survive strict scrutiny nor intermediate scrutiny. Inasmuch as Tasers are arms protected under the Second Amendment, the likelihood of Plaintiffs succeeding on the merits is clear.

The District obviously has an important interest in controlling crime and violence.  But this interest is insufficient to justify the ban on Tasers and stun guns.  Though stun guns or Tasers could conceivably be used for crimes as well as for legitimate self-defense, that is true of any arm. Private arms ownership always poses some risk, but our nation's founders agreed that people are entitled to keep and bear arms despite the risk that some will misuse them.  If that is true for deadly weapons like handguns, it is especially true for weapons that are nonlethal, including Tasers and stun guns.  And given a lack of evidence of substantial criminal misuse of electronic arms in the vast majority of the United States where they are legal, any suggestion of the need to ban them for prevention of violence would at best be based on speculation.  This is especially the case with the civilian model of Tasers which are specifically designed to curb misuse by the emission of the anti-felon identification tags ("AFIDs") upon activation of the device.  These tags allow police to trace the identify the purchaser of the device and thus serve as a substantial deterrent to misuse.  *See* Exhibit 4, Kroll Declaration, at para. 34.

In *Heller*, the Supreme Court struck down the District's handgun ban on the basis of a textual and historical analysis demonstrating that the ban infringed the Second Amendment right to keep arms in the home. 554 U.S. at 628–29 (holding that the D.C. handgun ban would "fail constitutional muster" under "any of the standards of scrutiny we have applied to enumerated constitutional rights").   Given that *Heller* applied a categorical analysis to invalidate DC's gun ban, this Court should similarly apply that analysis to strike down the city's Taser ban. *See Parker v. District of Columbia,* 478 F.3d at 400 ("Once it is determined – as we have done – that handguns are "Arms" referred to in the Second Amendment, it is not open to the District to ban them.")

In ruling on whether the District could ban a certain subset of the class of arms, firearms sometimes referred to as "assault weapons," the D.C. Circuit nonetheless opted not to employ the categorical approach, apparently in large part because the District's regulation was not a complete ban on the distinct class of arms of firearms. *See Heller v. District of Columbia*, 670 F.3d 1244, 1252 (D.C. Cir. 2011) (*Heller II*). Thus in that case, the D.C. Circuit established a "two-step approach to determining the constitutionality of the District's gun laws" there at issue.   *Id.* First, it asked "whether a particular provision impinges upon a right protected by the Second Amendment." *Id.* Second, if the provision impinges upon such a right, it said the court must "go on to determine whether the provision passes muster under the appropriate level of scrutiny." *Id.*   This approach is not appropriate in this case because the District ban is a complete prohibition on the possession and use of the entire class of electronic arms for self-defense even in the home, just as DC's gun ban in *Heller I* was a complete prohibition on the use of firearms for self-defense.[17]

---

[17] As Judge Kavanaugh demonstrated in dissent in *Heller II*, the Supreme Court's decision in *Heller* forecloses the application of any levels-of-scrutiny analysis in all Second Amendment cases. *See Heller II*, 670 F.3d at 1271–85 (Kavanaugh, J., dissenting).   This court, of course, is bound by the *Heller II* majority, to the extent it applies – and as discussed above, it does not apply – here.   In any event, Plaintiffs reserve the right to challenge that decision on appeal were this

Even if this court concludes that the District's law is not *categorically* unconstitutional, the law is nonetheless subject to strict scrutiny, which requires the District to justify the ban as necessary to advance the most compelling of government interests. Strict scrutiny applies because the District's law effectively amounts to a total ban on the exercise of the Second Amendment right to keep and bear a distinct class of arms by typical, law-abiding citizens even in the home. As the Supreme Court has explained, "strict judicial scrutiny [is] required" whenever a law "impinges upon a fundamental right explicitly or implicitly protected by the Constitution." *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 17 (1973). And the right to bear arms is not only specifically enumerated in the constitutional text; it was also counted "among those fundamental rights necessary to our system of ordered liberty" by "those who drafted and ratified the Bill of Rights." *McDonald*, 561 U.S. at 768, 778.

Indeed, the D.C. Circuit held in *Heller II* that "a regulation that imposes a substantial burden upon the core right of self-defense protected by the Second Amendment" must be subjected to strict scrutiny. 670 F.3d at 1257. *See also id.* at 1266. As shown above, the District's law – by denying citizens an entire class of non-lethal arms for self-defense – substantially burdens the core of the Second Amendment.

But even if this Court concludes that only intermediate scrutiny applies, the District's law still fails constitutional muster. As the Supreme Court recently reaffirmed, intermediate scrutiny demands that restrictions of constitutionally protected conduct be "narrowly tailored," *McCullen v. Coakley*, 134 S. Ct. 2518, 2535 (2014), *see also id.* at 2542, 2548 (Scalia, J., concurring), and

---

court to conclude that this two-step analysis is applicable here. At any rate, for the reasons explained herein, even under the *Heller II* majority's approach, the District of Columbia's laws denying in all circumstances the right to possess and use electronic weapons to all typical, law abiding citizens would fail constitutional muster under any standard of heightened scrutiny.

possess a "close fit between ends and means," *id.* at 2534 (majority opinion). Here, that close fit is absent.

The District's electronic arms ban fails any means-ends fit test as a matter of law, since the "means" the District has chosen extinguishes *altogether* the right to keep and bear a distinct class of arms for ordinary law-abiding citizens. It applies without exception to the very "law-abiding, responsible citizens" the Second Amendment was designed to protect. *Heller*, 554 U.S. at 635. The District cannot adopt a restriction that completely prohibits the core conduct protected by the Second Amendment no matter what its reasons, because that would empty that constitutional protection of all meaningful content. "[T]he enshrinement of constitutional rights necessarily takes certain policy choices off the table," *id.* at 636, and surely the choice to completely prohibit the core conduct that the right was enshrined to protect is one of them.   In *Heller v. District of Columbia,* 801 F.3d 264, the District sought to limit the registration of pistols to one a month on the basis that it "would further promote public safety by limiting the number of guns in circulation, as the District 'could reasonably conclude that more guns lead to more gun theft, more gun accidents, more gun suicides, and more gun crimes.'" *Id.* at 280.   The court rejected this argument saying, "taken to its logical conclusion, that reasoning would justify a total ban on firearms kept in the home." *Id.*   But that is exactly what the District has done here.   It has enacted a total ban on commonly used arms everywhere including the home apparently on the sole basis that "we just don't think people should have them."   This is cannot do under the Second Amendment. The District's electronic arms ban thus cannot stand.

The District's ban fails constitutional muster as a matter of law for another reason as well. The District's ban has nothing to do with public safety, because no basis exists to conclude that DC or the United States as a whole has any problem with the criminal misuse of Tasers or stun

guns. To survive intermediate scrutiny, a restriction must be "substantially related to the achievement" of the government's objective. *United States v. Virginia*, 518 U.S. 515, 533 (1996). "The burden of justification is demanding and it rests entirely on the State." *Id.* Here, the District simply cannot meet that burden as there is no evidence that the District's Taser ban advances public safety.

Denying law-abiding citizens of the District the right to use electronic weapons for self-defense in fact harms public safety. The District's violent-crime rate dwarfs that of any State in the Union. *See, e.g.*, Federal Bureau of Investigation, Crime in the United States by State: 2014, Table 5, available at https://goo.gl/hgoZBR (In 2014, the District had a violent crime rate of 1,244.4 per 100,000 residents; the highest rate of any state was 635.8 and the national rate was 365.5). It is readily apparent that the District's restrictive self-defense laws are not working to deter criminals from committing violent crimes, and the District's law-abiding residents need appropriate tools to defend themselves. Second Amendment rights are especially important in places where the need for self-defense is particularly "acute," *Heller*, 554 U.S. at 628, and in few places in the nation is this need more acute than in the District of Columbia. *Cf. Moore*, 702 F.3d at 937 ("[A] Chicagoan is a good deal more likely to be attacked on a sidewalk in a rough neighborhood than in his apartment on the 35th floor of the Park Tower.").[18]

Even if the District were able to show that its Taser ban would advance public safety (and, as explained above, it cannot), the District's ban would still have to be struck down because it fails

---

[18] The prohibition on electronic arms likely also serves to cause residents to keep and bear (both legally and illegally) lethal firearms for self-defense with the potential for greater loss of innocent life resulting from missed shots and non-innocent life from shots on target. This is another reason the electronic arms ban hinders public safety rather than promoting it. Indeed, the prohibition is simply irrational. Just as it has been shown that use of Tasers by law enforcement reduces injuries to both police and suspects, it stands to reason that use of the devices would reduce injuries to both assailants and their victims. *See* the studies provided at Exhibits 5 (Bozeman) & 6 (Alpert).

intermediate scrutiny's narrow tailoring requirement. That requirement "demand[s] a close fit between means and ends," and it forbids the government from "burden[ing] substantially more [protected conduct] than is necessary to further the government's legitimate interests." *McCullen*, 134 S. Ct. at 2534–35. Although intermediate scrutiny does not require the government to adopt the least restrictive means that will advance its interests, "the government must demonstrate that alternative measures that burden substantially less [protected conduct] would fail to achieve the government's interests." *Id*. at 2540.  And this it cannot do.

Whatever legitimate public safety interest DC may have concerning Tasers could easily be met by enacting appropriate regulatory measures similar to that existing with respect to other classes of legal arms.  Although this is not to suggest what those regulations might be, it is noteworthy that the District requires registration of self-defense sprays rather than an outright ban. D.C. Code §7-2502.14.  And the Commonwealth of Virginia prohibits possession of electronic arms on school grounds, Va. Code 18.2-308.1, and by felons outside the home, Va. Code 18.2-308.2.  These are examples of more narrowly tailored regulations the District could have adopted with respect to electronic weapons to address potential adverse effects their existence might occasion, but choose for whatever reason not to do so. "In short, the [District can] not [show] that it seriously undertook to address the problem with less intrusive tools readily available to it," *see McCullen*, 134 S. Ct. at 2539, but instead "has too readily foregone options that could serve its interests just as well" without unduly burdening Second Amendment rights, *id.* at 2537.

For all of the above reasons, Plaintiffs are likely to prevail on the merits of this action.

**V.     Plaintiffs will continue to suffer irreparable harm in the absence of preliminary relief.**

Having demonstrated that Plaintiffs are likely to prevail on the merits, we turn to whether Plaintiffs will suffer irreparable harm unless an injunction issues. *See Winter v. NRDC*, 555 U.S. 7, 22 (2008). The irreparable harm inquiry requires the court to assume Plaintiffs have demonstrated a likelihood of success on the merits and then to ask "whether that violation, if true, inflicts irremediable injury." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 303 (D.C. Cir. 2006).  Plainly here Plaintiffs are suffering irreparable injury.

Where the defendants' actions violate the plaintiffs' constitutional rights the requirement of "irreparable injury" is satisfied. As the D.C. Circuit has explained, "[s]uits for declaratory and injunctive relief against the threatened invasion of a constitutional right do not ordinarily require proof of any injury other than the threatened constitutional deprivation itself." *Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013) (brackets omitted) (quoting *Davis v. District of Columbia*, 158 F.3d 1342, 1346 (D.C. Cir. 1998)). Thus, "although a plaintiff seeking equitable relief must show a threat of substantial and immediate irreparable injury, a prospective violation of a constitutional right constitutes irreparable injury for these purposes." *Id.* (brackets omitted) (quoting *Davis*, 158 F.3d at 1346).

The principle that the violation of a constitutional right by itself constitutes irreparable harm derives from the Supreme Court's decision in *Elrod v. Burns* that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." 427 U.S. 347, 373 (1976). As the Seventh Circuit has explained in the context of a Second Amendment challenge:

> The loss of a First Amendment right is frequently presumed to cause irreparable harm based on the intangible nature of the benefits flowing from the exercise of those rights; and the fear that, if those rights are not jealously safeguarded, persons will be deterred, even if imperceptibly, from exercising those rights in the future.

*Ezell v. City of Chicago*, 651 F.3d 684, 699 (7th Cir. 2011) (internal quotation marks omitted). The Second Amendment also protects "intangible and unquantifiable interests." *Id*. Indeed, its "central component is the right to possess [arms] for protection," and violations of that right plainly "cannot be compensated by damages." *Id*. Thus, for violations of Second Amendment rights, as for violations of First Amendment rights, "irreparable harm is presumed." *Id*.

For these reasons, law-abiding citizens like Ms. Wright, Ms. Dean and Mr. Turner suffer irreparable harm each day they suffer an ongoing deprivation of their constitutional right to keep and bear a Taser for self-defense. The allegation of the violation, without more, satisfies the irreparable injury requirement. Even if Plaintiffs were required to establish a likelihood that the District's Taser ban will "chill" their exercise of constitutionally protected conduct, *see Chaplaincy of Full Gospel*, 454 F.3d at 299, they have satisfied this requirement by declaring that, but for the District's laws, they would obtain and carry Tasers for self-defense. *See* Exhibit 1 at para. 15; Exhibit 2 at para 13; Exhibit 3 at para. 14.

Each Plaintiff applied to Taser International to purchase a Taser, and each was denied in light of DC's prohibition against sale and importation of electronic arms into the District. *See* Exhibit 1 at para. 14; Exhibit 2 at Para. 12; Exhibit 3 at para. 13. Each day that the unconstitutional ban continues in force, Plaintiffs risk physical injury because they are unable to exercise their Second Amendment right to self-defense using arms of their choice. Of course, that injury cannot be compensated through money damages. *See Ezell*, 651 F.3d at 699. Each day the Taser ban remains in effect, Plaintiffs lack the security of knowing they have available an effective self-defense tool.  And each day the District's law remains in effect, Plaintiffs face the choice of limiting their travel to areas in which they feel safe without an electronic defense tool — or entering those areas without the ability to protect themselves adequately against violent crime. If

Plaintiffs prevail, the only appropriate remedy (and the only remedy Plaintiffs seek) is declaratory and injunctive in nature. *See id.* at 699 n.10.

## VI.     The balance of equities tips overwhelmingly in plaintiffs' favor.

The equities weigh strongly in Plaintiffs' favor. Plaintiffs continue to suffer an ongoing violation of their constitutional rights, and this ongoing violation constitutes irreparable injury. Any interests invoked by the District are entirely speculative. Plaintiffs only seek an injunction to allow them to keep and bear electronic arms of their choice for purposes of self-defense. Furthermore, to repeat the point, Plaintiffs do not seek an unfettered right to keep and bear electronic arms free from any District regulation or oversight. Plaintiffs challenge only the District's absolute ban on electronic weapons.

## VII.    An injunction is in the public interest.

For similar reasons, an injunction is also in the public interest. The D.C. Circuit has acknowledged the "obvious" fact that "enforcement of an unconstitutional law is always contrary to the public interest." *Gordon*, 721 F.3d at 653. So too have other circuits. *E.g.*, *K.A. ex rel. Ayers v. Pocono Mountain Sch. Dist.*, 710 F.3d 99, 114 (3d Cir. 2013) ("[T]he enforcement of an unconstitutional law vindicates no public interest."). Because enforcement of this unconstitutional law is by definition contrary to the public interest, the entry of a preliminary injunction serves the public interest as a matter of law. Moreover, the analysis with respect to the balancing of the equities indicates that the public interest is served by vindicating citizens' constitutional rights and affording them an opportunity to defend themselves in public, not by perpetuating an unconstitutional and ineffective restrictions on that right.

## VIII.    The court should enter final judgment for plaintiffs.

The Federal Rules of Civil Procedure permit this court to "advance the trial on the merits and consolidate it with the hearing" for a preliminary injunction. FED. R. CIV. P. 65(a)(2). "[W]hen the eventual outcome on the merits is plain at the preliminary injunction stage, the judge should, after due notice to the parties, merge the stages and enter a final judgment." *Morris v. District of Columbia*, 38 F. Supp. 3d 57, 62 n.1 (D.D.C. 2014) (quoting *Curtis 1000, Inc. v. Suess*, 24 F.3d 941, 945 (7th Cir. 1994)).

Plaintiffs suggest that unless the District can make an adequate showing of the need to develop a factual record to support their Taser ban, a permanent injunction is appropriate now.  In that regard the court should require the District to identify the specific areas appropriate for discovery and resolution at trial.  In the absence of such issues, the final outcome of this case will not depend on any facts presented at trial, and there would be no "genuine uncertainty at the preliminary injunction stage concerning what that outcome will be." *See Curtis 1000*, 24 F.3d at 945. Plaintiffs suggest that at this preliminary injunction stage, the court will have all the facts it needs and only questions of law will remain for resolution. As in *Moore*, "[t]he constitutionality of the challenged statutory provisions does not present factual questions for determination in a trial." 702 F.3d at 942. To the extent any questions of disputed material fact exists, those questions involve only "legislative facts" that bear on the justification for legislation, not "adjudicative facts" that must be determined at trial.  *Id.*  The Seventh Circuit's disposition in *Moore,* involving Illinois's complete ban on carrying firearms for personal protection, is particularly instructive here, as that court remanded for entry of a declaration of unconstitutionality and a permanent injunction upon reversing the district court's judgment granting the State of Illinois's motion to dismiss. *See*

*Moore*, 702 F.3d at 942. Likewise, here the court will have all the information it needs to make a final judgment upon conclusion of the preliminary injunction proceedings. The court should enter final judgment and put an end to the District's ban on law-abiding, responsible persons exercising their fundamental, individual right to keep and bear an electronic arm for self-defense.

## Conclusion

Plaintiffs have shown they are likely to prevail on the merits of this action. They have shown they suffer irremediable harm from the Taser ban. They have shown the balance of equities weighs in their favor. And they have shown that the public interest favors grant of an injunction. For the foregoing reasons, the court should preliminarily and permanently enjoin the District of Columbia's from enforcing its ban on the right of its residents to keep and bear electronic arms such as Tasers for self-defense.

Respectfully submitted

**CRYSTAL WRIGHT**

**TRACI DEAN**

**BRENDAN TURNER**

/s/ George L. Lyon, Jr., DC Bar No. 388678
Arsenal Attorneys
2111 Wilson Blvd, 8th Floor
Arlington, Virginia 22201
Email: gll@arsenalattorneys.com
Tel: 202-669-0442
Their Counsel

August 8, 2016

34