# EXHIBIT 4

WRIGHT v. DISTRICT OF COLUMBIA, CASE NO. 1:16-cv-1556 (JEB)

## DECLARATION UNDER PENALTY OF PERJURY OF DR. MARK KROLL

Mark W. Kroll, PhD, FACC, FHRS, FIEEE, FAIMBE, under penalty of perjury, deposes and states as follows:

1. My name is Mark W. Kroll. I am making this declaration to address the safety of the TASER International, Inc. ("TASER®") brand Electronic Control Device ("ECD"), including the safety of the device in the hands of non-law enforcement or military officers.

2. I understand this declaration will be submitted to the United States District Court for the District of Columbia in the case of *Crystal Wright v. District of Columbia*.

3. My full Curriculum Vitae ("C.V.") is attached to this declaration. Briefly, my background is that I retired from St. Jude Medical Inc. in July 2005, where I held various executive level positions since 1995, most recently as Senior Vice President and Chief Technology Officer, Cardiac Rhythm Management Division. I hold a B.S. degree in Mathematics and a M.S. degree and a Ph.D. degree in Electrical Engineering from the University of Minnesota and a M.B.A. degree from the University of St. Thomas. I have been issued more than 360 U.S. patents and am a Fellow of the: American College of Cardiology, Heart Rhythm Society, Institute of Electronics and Electrical Engineering, and the American Institute for Medicine and Biology in Engineering. I am a director of TASER and also a director of various medical device companies. I have written extensively on TASER brand ECDs. Along with Jeffrey Ho, I am the editor of TASER® Conducted Electrical Weapons: Physiology, Pathology, and Law. The full listing of my publications is contained in the attached C.V.

4. TASER ECDs are an ideal tool for law enforcement because they allow the temporary incapacitation of a violent or potentially violent individual without the necessity for direct hands-on physical control and restraint which has increased risks to both officers and suspects. What makes TASER ECDs an ideal tool for law enforcement also makes these devices an even better self-defense tool for civilians facing situations where deadly force would not be legally justified or for whom deadly force is not otherwise an option because of legal carry restrictions, or moral or ethical objections to the use of deadly force.

5. First, some basic facts concerning TASER ECDs. TASER has sold approximately 850,000 ECDs worldwide (this does not include civilian TASER ECDs). More than 18,000 law enforcement, private security, and military agencies utilize TASER ECDs. More than 7,290 of these agencies provide ECDs to all of their patrol officers. TASER has sold ECDs in 107 countries.

Approximately 275,000 civilian TASER ECDs have been sold to the general public since 1994.

6. The estimated ECD Field Use/Suspect Applications number in excess of 3.1 million as of April 20, 2016.   The estimated ECD Training/Voluntary Applications number in excess of 2.1 million as of April 20, 2016.  The total estimated ECD human applications of the devices number is in excess of 5 million today.[1]

7. Law enforcement officers often need to take violent criminals into custody. Many such criminals have partaken in substantial amounts of alcohol, narcotics, stimulants, or other legal and illegal substances. Most people probably would be surprised to learn that the main methods officers used prior to introduction of TASER ECDs in such situations rely on inflicting of pain to encourage volitional compliance. These include pain compliance, wrist locks and other forms of joint distortion, intentional grounding, tackling, grappling, pepper spray, multiple-officer techniques, and clubbing.

8. The use of pain compliance is complicated by the fact that many illegal drugs — as well as alcohol — are painkillers. As a result, these standard pain compliance techniques were frequently ineffective at subduing troublemaking suspects. Even worse, many of the dangerously drug-addled perpetrators exhibit extreme "superhuman" stamina and strength. There are numerous accounts of a person under the influence of drugs manhandling multiple law-enforcement officers. Many officers are injured along with those they are trying to take into custody. This problem is also prevalent with emotionally disturbed individuals.

9. With respect to the average civilian, he or she is not trained in joint locks or the use of a police type baton so those alternatives, to stop an assault, are not practical. To be sure, almost all jurisdictions do allow civilians to keep and carry pepper spray; however, again there are numerous examples of chemically fortified and emotionally disturbed suspects who were not stopped by the application of pepper sprays.

10. The ideal control tool for law enforcement officers must meet a number of requirements. First, it must be able to temporarily disable even the largest, most determined drug-anesthetized individual. Second, it must do so with a low probability of causing serious injury to anyone involved. Third, its effectiveness cannot be solely dependent on causing pain. Fourth, it must work reliably. And finally, it must be able to be used from a safer distance – say 15-21 feet – so that an arresting officer need not come within range of a suspect's blows or a hidden

contact weapon such as a knife.  All of these criteria are equally applicable to a tool that civilians could use to thwart a violent assault.

11. A TASER ECD satisfies these requirements. Under microprocessor control, the device temporarily, and relatively harmlessly, immobilizes a suspect by delivering a carefully engineered electrical signal specifically designed — with human physiology in mind — to have a low probability of causing serious injury.

12. Some have suggested that exposure to a TASER ECD can electrocute and cause a cardiac arrest; I will show below why that speculation is incorrect.

13. When the trigger of an ECD is pulled, a small compressed nitrogen capsule is punctured and launches 2 barbed darts at 55 meters per second, less than 20% of the speed of a bullet from a typical pistol. Each projectile, which weighs 1.6 grams, has a 9-millimeter-long tip designed to penetrate clothing and the insulating outer layer of skin. A pair of thin wires trail behind for up to 11 meters (on a law enforcement model), forming an electrical connection to the device (in the civilian model maximum range of the device is 5 meters).

14. Because the probes fail to reach the skin about 30% of the time, they are designed to adhere to clothing and the device will generate a brief "arcing" phase, which ionizes the intervening air to establish a conductive path for the electricity. The arcing phase has an open circuit peak voltage of 50,000 volts; that is, the voltage is 50 kV (kilovolts), but only until the arc appears or until the barbs make contact with conductive flesh, which offers around 600 ohms of resistance.[2]

15. The target's body is never exposed to the 50 kV. The X26 ECD – the model commonly used by law enforcement – delivers a pulse voltages of 600 V to the body.  The civilian models are comparable.  Once the probes establish a circuit, the device generates a series of 100-microsecond pulses at a rate of 19 PPS (pulses per second) for a standard 5 seconds. Each pulse carries 100 microcoulombs of charge, so the average current is 1.9 mA (milliamperes). The civilian model then steps down to 12 PPS and eventually down to 8 PPS thus delivering 1.2 mA and finally 0.8 mA. To induce motor-nerve mediated muscle contractions without risking electrocution, the signal was designed to exploit the electrophysiological differences between heart muscle and skeletal muscle.

16. Skeletal muscle constitutes 40% of a typical person's mass and is responsible for making the biceps flex, the fingers type, and the eyelids wink. It's organized into bundles of single-cell fibers that stretch from tendons attached to the skeleton. When the brain orders a muscle to flex, an electrical impulse travels

3

down a motor nerve to its termination at the midpoint of a muscle fiber. There the electrical signal changes into a chemical one, and the nerve ending sprays a molecular transmitter, acetylcholine, onto the muscle. In the milliseconds before enzymes have a chance to chew it up, some of the acetylcholine binds with receptors, called gated-ion channels, on the surface of the muscle cell. When acetylcholine sticks to them, they open, allowing the sodium ions in the surrounding salty fluid to rush in.

17. The movement of those ions raises the cell's internal voltage, opening nearby ion channels that are triggered by voltage instead of by acetylcholine. As a result, a wave of voltage rolls outward along the fiber toward both ends of the muscle, moving as fast as 5 meters per second. As the voltage pulse spreads, it kick-starts the molecular machinery that causes contraction of the muscle fiber.

18. By directly stimulating the motor nerves with electricity, an ECD can stimulate the muscle and get the same effect.

19. The force with which a skeletal muscle contracts depends on the frequency at which its nerve fires. The amount of contraction elicited is proportional to the stimulation rate, up to about 70 pulses per second. At that point, called tetanus, contractions can be potentially dangerously strong. (The same thing happens in the disease tetanus, whose primary symptom, caused by the presence of a neurotoxin, is prolonged contraction of skeletal fibers.) The ECD, with its 19 pulses per second, operates in the clonus region, far enough from the tetanus region so that the muscles contract continuously but without causing significant damage. (The civilian units deliver 19 PPS and step down to 8 PPS).

20. Heart muscle has a somewhat different physical and electrical structure than skeletal muscle. Instead a single long fiber that stretches from tendon to tendon, heart muscle is composed of interconnected fibers made up of many cells. The cell-to-cell connections have a low resistance, so if an electrical impulse causes a heart cell to contract, its neighbors will quickly follow suit. With the help of some specialized conduction tissue, this arrangement makes the 4 chambers of the heart beat in harmony and pump blood efficiently. A sufficiently large electrical charge at the right time can turn the coordinated pump into a quivering mass of muscle. That's just what electrocution does: a sufficiently strong pulse of electricity causes the heart's electrical activity to become chaotic, and it stops pumping adequately – a situation known as ventricular fibrillation. Electrocution can also be performed by stimulating with a series of many lower-energy pulses.

4

21. The ECD takes advantage of 2 natural protections against electrocution that arise from the differences between skeletal and cardiac muscle. The first – anatomy – is so obvious that it is typically overlooked. The motor nerves and associated skeletal muscles are on the *outer* shell of the body; the heart is nestled farther inside. In the upper body, the skeletal muscles are arranged in bands surrounding the rib cage. Because of skeletal muscle fibers' natural inclination to conduct electricity along their length, an electrical current injected into such a muscle tends to follow the grain around the chest rather than penetrate toward the heart. This is analogous to a beltway freeway that wraps around a city.[3]

22. The second protection results from the different timing requirements of the nerves that trigger muscle contractions and the heart's intrinsic electronics. To lock up skeletal muscle without causing ventricular fibrillation, a TASER ECD uses a highly specific configuration of pulse length, repetition rate, and charge.

23. The key metric that electrophysiologists use to describe the relationship between the effect of pulse length and current is chronaxie, a concept similar to what engineers call the system time constant. Electrophysiologists determine a nerve's chronaxie by first finding the minimal amount of current that triggers a nerve cell using a long pulse. In successive tests, the pulse is shortened. A briefer pulse of the same current is less likely to trigger the nerve. Thus, to induce contraction of the attached muscle the current must be increased with these briefer pulses. The chronaxie is defined as the minimum stimulus length to trigger a cell at twice (2x) the current determined from that very long pulse. Shorten the pulse below the chronaxie and it will take more current to have any effect. Thus, the ECD is designed to deliver pulses of a length just short of the chronaxie of skeletal muscle nerves but far shorter than the chronaxie of heart muscle nerves.

24. There are basically 2 ways to electrically cause a cardiac arrest (electrocute): (1) Deliver a very high-energy pulse into the "vulnerable" period during a normal heartbeat cycle, or (2) Stimulate with a series of many lower-energy pulses.

25. The international safety standard for the common farm and garden electric fence is International Electrical Commission ("IEC") 60335 which reflects the best scientific knowledge and a century of electrical safety research. IEC 60335 limits the energy of any single pulse to 5 joules of energy.[4] All presently sold TASER ECDs satisfy this by a wide margin delivering less than 0.1 joule in a pulse.

26. As far as stimulating with many pulses, IEC 60335 limits the power to 2.5 watts which is less than the typical 4-watt power of a child's night light. The popular

law-enforcement X26 ECD delivers 1.8 watts and thus satisfies this safety standard. The civilian ECD has a lower average power of 1.2 watts over its full cycle.

27. When factoring in that the TASER probes are likely to land externally to current-shunting skeletal muscle not near the heart, the result is a significant margin of safety. For barbs deeply inserted directly over the heart, the margin is slimmer, though, and a key question often asked is, is that safety margin adequate? To answer that definitively, consideration must be made of what has been learned from the devices' use in everyday life.

28. In the United States, there are about 800 arrest-related-deaths ("ARDs") annually, according to the U.S. Department of Justice's Bureau of Justice Statistics.[5] Studies have shown that ECDs were temporally used in about 30% of ARD incidents in the United States. Although ECDs were involved in a sizable fraction of these deaths, one should not illogically leap to the conclusion that ECDs caused these deaths. One study found that 100% of ARDs involved the use of handcuffs, and one might apply the same faulty logic to argue against "killer cuffs," but that would, of course, be absurd. The use of ECDs has reduced suspect injury rates by about 2/3 according to studies funded by the U.S. Department of Justice ("DOJ").[6,7] Other studies have found a 2/3 reduction in fatal police shootings.[8] Imagine that someone invented a pill that reduced the mortality rate of malaria by 2/3. They would receive acclaim and likely a Nobel prize. No one would turn this upside-down and accuse the pill of killing the residual 1/3 of malaria patients. Nevertheless, some highly-paid litigation experts have claimed that some subjects have actually been electrocuted by an ECD.[9,10] Fortunately, these anecdotal speculations have all been well refuted.[11-14] It is an urban myth that anyone has been electrocuted by an ECD. However, even if the handful of anecdotes were believed, the ECD is seen to be amazingly safe compared to the 5 million human applications. Additionally, there has never been a reported incident of an alleged civilian ECD-caused death.

29. There will always be some degree of violence in many law enforcement arrests, and a reliance on handguns and hand-to-hand combat can lead to terrible use-of-force dilemmas for law enforcement officers. For example, when a suspect brandishing a knife is within striking distance (generally considered from 21-30 feet due to the ability of a suspect to transit such a distance in 1.5 to 2 seconds), law-enforcement U.S. officers are trained to shoot that person. Having a TASER ECD available to those officers often gives them an opportunity to disarm suspects in a manner that's likely to be safer for all involved. It is the prevalence of such scenarios that has persuaded so many law enforcement agencies to pay

twice (2x) as much for an ECD – on the order of $1000 per device – as they do for a traditional handgun.

30. The implication for the civilian population is manifest. The same violent criminals that law enforcement arrest are often the ones who prey on innocent civilians. Although every jurisdiction in the U.S., including the District of Columbia, now allows the possession of firearms for personal defense as well as allowing at least some civilians to carry a firearm in public for personal protection, not every criminal assault justifies the use of deadly force in response. And of course there are a substantial number of individuals who are religiously or philosophically opposed to the use of deadly force, who would decline to keep or carry a firearm for personal defense. The ECD is an ideal device for situations requiring force — but not deadly force — to stop a violent attack and can nonetheless be a useful means of stopping even a deadly attack for someone who is otherwise unable or unwilling to employ deadly force.

31. I am informed that civilians in the District of Columbia may carry pepper spray and other tools such collapsible police batons. Those civilians, just like law enforcement officers, may face violent criminals who are not susceptible to pepper spray or some other pain control or physical techniques. And of course physical techniques are likely not a successful strategy where the attacker is significantly bigger and stronger than the victim. The TASER ECD can allow such potential victims the opportunity to stop a violent assault and escape the danger with the likelihood of little if any permanent injury to the assailant. Recall that the DOJ-sponsored studies show that injuries to both suspects and officers are significantly reduced. [6,7]

32. Injuries from an ECD exposure generally are minor and mostly result from contact with the ground occurring after incapacitation. It is common practice in the training of law enforcement officers for them to undergo an ECD exposure.[1] Many departments require it and the overwhelming number of departments either allow, encourage, or mandate it. It stands to reason that these departments would not willingly expose their officers to a device they considered unreasonably dangerous.

33. The major difference between the law enforcement ECD model and the civilian TASER model is that the average power is slightly lower at 1.2 watts. The civilian normal application lasts 30 seconds (rather than 5 seconds for the law enforcement versions) to give the victim of the assault the opportunity to escape the scene and summon law enforcement assistance. It does this by stepping down to a lower pulse rate and power after the first 5 seconds as mentioned

7

earlier. Studies have shown that the 30 second exposure does not increase the
potential for electrocution of a person subjected to an ECD exposure. Electricity
does not build up like poison.

34. The potential for abuse of the Taser ECD is limited. When a civilian TASER
ECD is deployed, the device emits numerous (up to 24) small tags called Anti-
Felon IDentification (AFID) tags at the scene. The AFIDs contain the serial
number of the TASER cartridge that has been deployed. TASER maintains a
registry of these cartridges sold to civilians, allowing law enforcement to trace
the purchaser of the cartridge using the data contained on the AFIDs in the event
of misuse of the device.

The above declaration, given under penalty of perjury is true and correct to the best
of my knowledge, information and belief.

_____
Mark W. Kroll                                        Dated: 25 April 2015

8

# <u>Scientific Authorities</u>

1.   Brewer J, Kroll M. Field Statistics Overview. In: Kroll M, Ho J, eds. *TASER Conducted Electrical Weapons: Physiology, Pathology, and Law*. New York City: Springer-Kluwer; 2009.

2.   Dawes DM, Ho JD, Kroll MW, Miner JR. Electrical characteristics of an electronic control device under a physiologic load: a brief report. *Pacing and clinical electrophysiology : PACE*. 2010;33(3):330-336.

3.   Panescu D, Stratbucker RA. Current Flow in the Human Body. IEEE EMBC Proceedings 2009:63-84.

4.   International_Electrotechnical_Commission. Household and similar electrical appliances – Safety – IEC 60335-2-76: Particular requirements for electric fence energizers. 2006.

5.   Mumola C. Arrest-Related Deaths in the United States, 2003-2006. *Bureau of Justice Statistics Special Report* 2011.

6.   MacDonald JM, Kaminski RJ, Smith MR. The effect of less-lethal weapons on injuries in police use-of-force events. *Am J Public Health*. 2009;99(12):2268-2274.

7.   Taylor B, Woods D, Kubu B, et al. Comparing safety outcomes in police use-of-force cases for law enforcement agencies that have deployed conducted energy devices and a matched comparison group that have not: A quasi-experimental evaluation. *NIJ Monograph*. 2009.

8.   Ferdik FV, Kaminski RJ, Cooney MD, Sevigny EL. The Influence of Agency Policies on Conducted Energy Device Use and Police Use of Lethal Force. *Police Quarterly*. 2014:1098611114548098.

9.   Zipes DP. TASER Electronic Control Devices Can Cause Cardiac Arrest in Humans. *Circulation*. 2014;129(1):101-111.

10.  Zipes DP. Sudden cardiac arrest and death following application of shocks from a TASER electronic control device. *Circulation*. 2012;125(20):2417-2422.

11.  Kroll MW, Lakkireddy DR, Stone JR, Luceri RM. TASER electronic control devices and cardiac arrests: coincidental or causal? *Circulation*. 2014;129(1):93-100.

12.  Vilke GM, Chan TC, Karch S. Letter by Vilke et al regarding article, "sudden cardiac arrest and death following application of shocks from a TASER electronic control device". *Circulation*. 2013;127(1):e258.

13.  Ho JD, Dawes DM. Letter by Ho and Dawes regarding article, "sudden cardiac arrest and death following application of shocks from a TASER electronic control device". *Circulation*. 2013;127(1):e259.

14.  Heegaard WG, Halperin HR, Luceri R. Letter by Heegaard et al regarding article, "Sudden cardiac arrest and death following application of shocks from a TASER electronic control device". *Circulation*. 2013;127(1):e260.