**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CRYSTAL WRIGHT, et al.,<br><br>*Plaintiffs*,<br>v.<br><br>DISTRICT OF COLUMBIA and CATHY LANIER, in her official capacity as Chief of Police for the Metropolitan Police Department,<br><br>*Defendants.* | Civil Action No. 1:16-1556 (JEB) |

# BRIEF OF EVERYTOWN FOR GUN SAFETY AS AMICUS CURIAE


DEEPAK GUPTA
JONATHAN E. TAYLOR
GUPTA WESSLER PLLC
1735 20th Street, NW
Washington, DC 20009
(202) 888-1741
*deepak@guptawessler.com*

MARK ANTHONY FRASSETTO
EVERYTOWN FOR GUN SAFETY
P.O. Box 4184
New York, NY 10163

*Counsel for Amicus Curiae Everytown for Gun Safety*


September 16, 2016

## CORPORATE DISCLOSURE STATEMENT

Everytown for Gun Safety has no parent corporations. It has no stock and hence no publicly held company owns 10% or more of its stock.

## TABLE OF CONTENTS

Corporate disclosure statement ..... i

Table of authorities ..... iii

Introduction and interest of amicus curiae ..... 1

Argument ..... 2

I. The challengers' categorical "common use" theory is illogical, dangerous, and inconsistent with D.C. Circuit precedent ..... 2

II. To the extent that this Court decides to reach the merits and finds that the Second Amendment applies, it should not subject the law to strict scrutiny. ..... 7

Conclusion ..... 10

## TABLE OF AUTHORITIES*

### Cases

*Caetano v. Massachusetts*,
136 S. Ct. 1027 (2016) .......... 2, 3

*Dearth v. Lynch*,
781 F.3d 32 (D.C. Cir. 2015). .......... 8

*District of Columbia v. Heller*,
554 U.S. 570 (2008) .......... 1, 2, 5

* *Friedman v. City of Highland Park*,
784 F.3d 406 (7th Cir. 2015) .......... 4, 5, 6

* *Heller v. District of Columbia*,
670 F.3d 1244 (D.C. Cir. 2011) .......... 4, 8

*Heller v. District of Columbia*,
801 F.3d 264 (D.C. Cir. 2015) .......... 8

*Jackson v. City & County of San Francisco*,
746 F.3d 953 (9th Cir. 2014) .......... 6

*Kolbe v. Hogan*,
813 F.3d 160 (4th Cir. 2016) .......... 8

*McDonald v. City of Chicago*,
561 U.S. 742 (2010) .......... 6

*National Rifle Association v. Bureau of Alcohol, Tobacco, Firearms, and Explosives*,
700 F.3d 185 (5th Cir. 2012) .......... 8

*New York State Rifle and Pistol Association v. Cuomo*,
804 F.3d 242 (2d Cir. 2015) .......... 8

*Schrader v. Holder*,
704 F.3d 980 (D.C. Cir. 2013) .......... 8

*State v. DeCiccio*,
105 A.3d 165 (Conn. 2014) .......... 9

*State v. Hermann*,
873 N.W.2d 257 (Wis. Ct. App. 2015) .......... 9

* Authorities upon which we chiefly rely are marked with asterisks.

*Tyler v. Hillsdale County Sheriff's Department*,
—F.3d—, 2016 WL 4916936 (6th Cir. Sept. 15, 2016) ........ 8

*Tyler v. Hillsdale County Sheriff's Department*,
775 F.3d 308 (6th Cir. 2014) ........ 8

*United States v. Booker*,
644 F.3d 12 (1st Cir. 2010) ........ 8

*United States v. Chester*,
628 F.3d 673 (4th Cir. 2010) ........ 8

*United States v. Chovan*,
735 F.3d 1127 (9th Cir. 2013) ........ 8

*United States v. Marzzarella*,
614 F.3d 85 (3d Cir. 2010) ........ 8

*United States v. Reese*,
627 F.3d 792 (10th Cir. 2010) ........ 8

*United States v. Williams*,
616 F.3d 685 (7th Cir. 2010) ........ 8

**Statutes**

1837 Ala. Acts 7, No. 11 ........ 9

Mass. Gen. Laws ch. 194, §§ 1–2 (1850) ........ 9

1890 Okla. Sess. Laws 475–76, ch. 25 §§ 18–19 ........ 9

1906 Va. Acts 9, ch. 11 ........ 9

1907 Ala. Acts 80, No. 55 ........ 9

1912 N.J. Laws 365 ........ 9

1923 Cal. Stat. 695, ch. 339, § 1 ........ 9

1925 N.J. Laws 185 ........ 9

1931 N.Y. Laws 1033 ........ 9

1931 Tenn. Priv. Acts 1089 ........ 9

Pub. L. No. 275, § 14, codified at 47 Stat. 650 (1932) ........ 9

Pub. L. No. 85-623, codified at 72 Stat. 562 (1958) ........ 9

1959 N.M. Laws 245 .......... 9

**Other authorities**

Joseph Blocher & Darrell A.H. Miller, *Lethality, Public Carry, and Adequate Alternatives*, 53 Harv. J. on Legis. 279 (2016) .......... 5, 7

Cody J. Jacobs, *End the Popularity Contest*, 84 Tenn. L. Rev. 231 (2015) .......... 4, 5, 6, 7

William J. Krouse, *Gun Control Legislation*, Congressional Research Service (Nov. 14, 2012) .......... 2

## INTRODUCTION AND INTEREST OF AMICUS CURIAE

Everytown for Gun Safety is the nation's largest gun-violence-prevention organization, with over three million supporters—including over 1,800 current and former mayors of cities across the country and a network of more than 1,000 survivors of gun violence who are leaders in campaigns to support common-sense gun laws in their communities. Everytown has drawn on its expertise to file briefs in numerous Second Amendment cases, including those involving the constitutionality of laws in the District of Columbia. *See, e.g.*, *Wrenn v. District of Columbia*, No. 16-7025 (D.C. Cir.); *Peruta v. San Diego*, No. 10-56971 (9th Cir.); *Kolbe v. Hogan*, No. 14-1945 (4th Cir.); *Peña v. Lindley*, No. 15-15449 (9th Cir.). Although Everytown takes no position on stun-gun legislation of the sort involved in this case, it has a strong interest in ensuring that Second Amendment jurisprudence is informed by a proper understanding of both doctrine and history.

Everytown files this brief to make two doctrinal points in response to arguments advanced by the challengers—arguments that, if accepted, could have profound effects on Second Amendment cases more broadly. *First*, the challengers contend that the law is "categorically unconstitutional" under *District of Columbia v. Heller*, 554 U.S. 570 (2008), because it prohibits "a class of commonly used arms." Mot. 1, 7. But no federal court has held that governments are categorically precluded from prohibiting any arm deemed in "common use" based on such a sales threshold. In fact, the Seventh Circuit has expressly rejected a *less extreme* theory of common use as circular and contrary to federalism, and the D.C. Circuit (among others) has implicitly done the same. If the challengers' theory were the law, moreover, it would create perverse incentives for gun manufacturers, threatening public safety. *Second*, the challengers ask for strict scrutiny should the Court reject their broad theory. But if the Court decides to reach the merits and concludes that the Second Amendment applies, intermediate scrutiny is the correct standard.

## ARGUMENT

### I. The challengers' categorical "common use" theory is illogical, dangerous, and inconsistent with D.C. Circuit precedent.

**A.** The challengers want this Court to hold that D.C.'s law is *necessarily* unconstitutional under the Second Amendment because the law (in their view) "prohibits a class of arms" that are "commonly used for self-defense." Mot. 2, 23–24; *see id.* at 1 (arguing that the law is "categorically unconstitutional"); *id.* at 25 (advocating a "categorical analysis"). On this theory, as soon as *any* type of weapon achieves a certain minimal nationwide sales or manufacturing threshold—and what the magic number is, the challengers do not say—then the Second Amendment confers an absolute right to acquire it in every state.

The challengers locate this "common use" theory in *Heller*, which invalidated a law that "amount[ed] to a prohibition of an entire class of 'arms' that is overwhelmingly chosen by American society for [self-defense]." 554 U.S. at 628; *see* Mot. 4 ("[The law] must be struck down categorically based [on] *Heller*'s precedent."). *Heller* held that "[u]nder any of the standards of scrutiny that we have applied to enumerated constitutional rights, banning from the home the most preferred firearm in the nation to 'keep' and use for protection of one's home and family, would fail constitutional muster." 554 U.S. at 628–29 (quotations, citation omitted). The challengers ask this Court to stretch this holding far beyond the context of that case—which concerned a law prohibiting a class of 114 million arms, *see* William J. Krouse, *Gun Control Legislation*, Congressional Research Service, at 8 (Nov. 14, 2012), *at* http://bit.ly/1bNw2Br—to compel the invalidation of a law prohibiting a weapon that is hundreds of times less common.

The challengers support this sweeping position by relying heavily on the Supreme Court's five-paragraph per curiam opinion in *Caetano v. Massachusetts*, 136 S. Ct. 1027 (2016), which vacated and remanded a decision by the Massachusetts Supreme Judicial Court that had upheld

a conviction under that state's stun-gun prohibition. But the Supreme Court did not strike down Massachusetts' law, nor did it expand *Heller* in the slightest. Instead, it simply remanded the case and held that "the explanation the Massachusetts court offered for upholding the law"—"that the Second Amendment does not extend to stun guns" because they are a "modern invention" and are not used in the military—"is inconsistent with *Heller*'s clear statement[s]." *Id.* at 1027–28. Only Justice Alito (joined by Justice Thomas) would have adopted the broad categorical argument the challengers urge here. *See id.* at 1032–33 (2016) (Alito, J., concurring) (expressing the view that, because "[h]undreds of thousands of Tasers and stun guns have been sold to private citizens," a "categorical ban of such weapons therefore violates the Second Amendment"). No other Justice expressed agreement with this view, and it is not the law in any circuit.

It is certainly not the law in the D.C. Circuit. Several years ago, in a challenge to a D.C. law prohibiting a class of semiautomatic firearms defined as "assault weapons" (including the AR–15), as well as a class of large-capacity magazines (those capabale of holding more than ten rounds), the D.C. Circuit rejected the argument that the law must be struck down because it prohibits a category of arms that are "widely owned by private citizens today for legitimate purposes." Br. of Appellants in *Heller v. District of Columbia*, No. 10-7036, 2010 WL 5108968, at *45–*51 (Aug. 11, 2010). The Court *assumed* that the weapons were in common use for self-defense purposes, noting that roughly "1.6 million AR–15s alone have been manufactured since 1986, and in 2007 this one popular model accounted for 5.5 percent of all firearms, and 14.4 percent of all rifles, produced in the U.S. for the domestic market," while "fully 18 percent of all firearms owned by civilians in 1994 were equipped with magazines holding more than ten rounds, and approximately 4.7 million more such magazines were imported into the United States between 1995 and 2000." *Heller v. District of Columbia*, 670 F.3d 1244, 1261 (D.C. Cir.

2011) (*Heller II*). Even so, the Court *rejected* a categorical analysis in favor of intermediate scrutiny and *upheld* the law.

The challengers in this case concede that *Heller II* "opted not to employ the categorical approach" (and in fact rejected it). Mot. 25. Yet they say that they "reserve the right to challenge that decision on appeal." *Id.* n.17. Maybe so. But *Heller II* unquestionably remains binding on this Court, and it requires rejection of the challengers' categorical theory of common use.

**B.** Even if this Court were free to contravene *Heller II*, it should reject the challengers' theory because it is unworkable, illogical, and would lead to absurd results, as the Seventh Circuit has explained. *See Friedman v. City of Highland Park*, 784 F.3d 406 (7th Cir. 2015), *cert. denied*, 136 S. Ct. 447 (2015). To begin, it is anything but clear what common use means. "[W]hat line separates 'common' from 'uncommon' ownership is something [*Heller*] did not say." *Id.* at 409 (finding "uncertainty" as to whether assault weapons are "commonly owned" based on the sales totals discussed above); *see generally* Cody J. Jacobs, *End the Popularity Contest*, 84 Tenn. L. Rev. 231 (2015), *at* http://bit.ly/1gVsyGZ. Like *Heller*, the challengers are silent on what numerical threshold must be reached before a weapon achieves "common use" sufficient to trigger a constitutional mandate that the weapon be made available throughout the country. But they necessarily believe that the number is no more than a few hundred thousand sales over the course of a quarter century—or less than a tenth of a percent of the American population (and total gun stock). This raises a few questions: What number is too small in their eyes? Fifty thousand? Ten thousand? Less? Is their proposed test regional or national? Does it look to ownership numbers, sales numbers, or manufacturing numbers? If a survey revealed that half a million people own firearms without serial numbers, would the federal serialization requirement suddenly become unconstitutional because unmarked firearms are in common use? If not, why not? And what would become of the federal prohibition on the manufacture of machine guns

(whose constitutionality *Heller* endorsed, *see* 554 U.S. at 627) if some small slice of the American population owned a few hundred thousand M–16s? The challengers offer no answers to any of these questions.

More fundamentally, "relying on how common a weapon is at the time of litigation [is] circular." *Friedman*, 784 F.3d at 409. As Judge Easterbrook observed in rejecting the same theory of common use rejected by the D.C. Circuit in *Heller II*, "it would be absurd to say that the reason why a particular weapon can be banned is that there is a statute banning it, so that it isn't commonly owned. A law's existence can't be the source of its own constitutional validity." *Id.; see also* Joseph Blocher & Darrell A.H. Miller, *Lethality, Public Carry, and Adequate Alternatives*, 53 Harv. J. on Legis. 279, 288–89 (2016) (discussing the "central circularity" that plagues common use: "what is common depends largely on what is, and has been, subject to regulation").

Consider just some of the absurd results that the challengers' market-share "common use" test would produce. By focusing on total sales and manufacturing figures, the test would give the firearms industry "the ability to unilaterally make new [highly dangerous] firearms protected simply by manufacturing and heavily marketing them" before the government has had the chance to assess their danger and determine whether to regulate them. Jacobs, *End the Popularity Contest*, at 265. The result would be that, once gun manufacturers ensure that a particular type of weapon has attained whatever market penetration is enough to make it "common," that weapon would then become constitutionally sacrosanct. *Id.* If that were the rule, it would "put[] a great deal of power"—*constitutional* power—"into the hands of gun manufacturers." *Id.* at 267.

By doing so, it would create perverse incentives for manufacturers to overproduce the very types of firearms that most warrant regulatory attention, and to flood the market with firearms possessing new—and potentially dangerous—technology before regulators could assess their safety. That would undoubtedly "hinder efforts to require consumer safety features on guns."

*Id.* Given the emergence of new firearm technology (like 3-D-printed gun components undetectable using traditional methods), and given the inevitability of future technological developments, the challengers' common-use theory, if endorsed by this Court, would pose serious threats to public safety. *Id.*

And that is to say nothing of the federalism consequences of adopting a test that looks to nationwide manufacturing and sales totals. Under that test, whenever a new, potentially dangerous firearm feature became available, state and local governments would either have to prohibit it immediately, and in unison, or else forfeit their ability to do so going forward. If some states chose to gather more information before regulating, or if their citizens simply had a different position on gun policy, those legislative policy judgments would have constitutional effect far beyond those states' borders.

Legislators' decisions in some parts of the country, however, should not make laws in other parts any "more or less open to challenge under the Second Amendment." *Friedman*, 784 F.3d at 408. If they did, that "would imply that no jurisdiction other than the United States as a whole can regulate firearms. But that's not what *Heller* concluded." *Id.* at 412. Because our Constitution "establishes a federal republic where local differences are cherished as elements of liberty," federalism is "no less part of the Constitution than is the Second Amendment." *Id.* The Supreme Court's decision in *Heller* (as applied to the states in *McDonald v. City of Chicago*, 561 U.S. 742 (2010)) "does not foreclose all possibility of experimentation" by state and local governments, *Friedman*, 784 F.3d at 412, but rather permits them to do what they have long done in the realm of firearm legislation: "experiment with solutions to admittedly serious problems," *Jackson v. City & Cnty. of San Francisco*, 746 F.3d 953, 970 (9th Cir. 2014); *see also McDonald*, 561 U.S. at 784 (noting that "[s]tate and local experimentation with reasonable firearms regulations will continue under the Second Amendment"). The challengers' test would eviscerate their ability to do so.

At the same time, the challengers' test also has the potential to underprotect the Second Amendment right by "creat[ing] an incentive for governments that are interested in restricting access to firearms to ban new weapons completely before they can become popular," even if those weapons would be "extremely effective for self-defense." Jacobs, *End the Popularity Contest*, at 265. But, as scholars have remarked, "[i]f heavy regulation can prevent a weapon from becoming a constitutionally protected 'Arm,' then the Second Amendment right seems hollow indeed." Blocher & Miller, *Lethality*, at 288.

The rights enumerated in our Constitution protect individual liberty by restraining the power of popularly elected legislators. Yet the challengers' constitutional theory would give policymakers (as well as private industry and lobbying groups like the NRA) unprecedented power to define the scope of the Second Amendment right—either by broadening it or by narrowing it. That cannot be the law.

To see why, suppose that in 2004 Congress had renewed the federal prohibition on large-capacity magazines and assault weapons that had been enacted ten years earlier, rather than let it lapse. Had Congress made that policy decision, those weapons would not be in common use today, and thus would not be protected on the challengers' market-share theory. The answer should not be any different because Congress instead decided to let the law lapse. A single twenty-first-century legislative decision should not dictate whether a different legislative judgment made a decade later comports with the Second Amendment. Yet that is the upshot of the challengers' common-use theory. It should be rejected.

## II. To the extent that this Court decides to reach the merits and finds that the Second Amendment applies, it should not subject the law to strict scrutiny.

The challengers' second argument is no less novel: they want this Court to apply strict scrutiny in assessing whether the challenged law is constitutional. But only two circuit decisions

have applied strict scrutiny in the eight-plus years since *Heller*, and both were promptly vacated and taken en banc. *See Kolbe v. Hogan*, 813 F.3d 160 (4th Cir. 2016) (facial challenge to state assault-weapon prohibition), *reh'g en banc granted*, 636 F. App'x 880 (Mar. 6, 2016); *Tyler v. Hillsdale Cnty. Sheriff's Dep't*, 775 F.3d 308 (6th Cir. 2014) (as-applied challenge to federal law prohibiting plaintiff from possessing any firearm for life), *reh'g en banc granted* (Apr. 21, 2015), *decided en banc*, —F.3d—, 2016 WL 4916936 at *10 (6th Cir. Sept. 15, 2016) (en banc) ("conclud[ing] that intermediate scrutiny is the appropriate standard").

On the other side of the ledger, scores of circuit decisions have applied intermediate scrutiny to laws that burden protected Second Amendment conduct based on a historical understanding of the right.[1] The D.C. Circuit, for its part, has consistently subjected such laws to intermediate scrutiny. *See Heller II*, 670 F.3d at 1256–57, 1261–62 (assault-weapon and large-capacity-magazine prohibition; registration requirement); *Schrader v. Holder*, 704 F.3d 980, 989 (D.C. Cir. 2013) (as-applied challenge to law prohibiting plaintiff from possessing a firearm for life); *Heller v. District of Columbia*, 801 F.3d 264 (D.C. Cir. 2015) (*Heller III*) (registration and inspection requirements; one-pistol-per-month rule).

If this Court reaches the merits and concludes that the Second Amendment applies, it should follow the lead of the D.C. Circuit (and every other circuit) and subject the law to intermediate scrutiny. Indeed, even cases *favorable* to the challengers have applied intermediate scrutiny to similar prohibitions. *See State v. DeCiccio*, 105 A.3d 165, 204–06 (Conn. 2014) (holding

[1] A Westlaw search for "*Heller*" and "Second Amendment" and "intermediate scrutiny" yields 70 federal circuit decisions, minus the two (now-vacated) decisions that mentioned intermediate scrutiny only to reject it in favor of strict scrutiny. *See, e.g. United States v. Booker*, 644 F.3d 12, 25 (1st Cir. 2010); *N.Y. State Rifle and Pistol Ass'n v. Cuomo*, 804 F.3d 242, 261 (2d Cir. 2015); *United States v. Marzzarella*, 614 F.3d 85, 97 (3d Cir. 2010); *United States v. Chester*, 628 F.3d 673, 683 (4th Cir. 2010); *National Rifle Ass'n v. Bureau of Alcohol, Tobacco, Firearms, and Explosives*, 700 F.3d 185, 206 (5th Cir. 2012); *United States v. Williams*, 616 F.3d 685, 692 (7th Cir. 2010); *United States v. Chovan*, 735 F.3d 1127, 1139 (9th Cir. 2013); *United States v. Reese*, 627 F.3d 792, 802 (10th Cir. 2010); *Dearth v. Lynch*, 781 F.3d 32, 44 (D.C. Cir. 2015).

that intermediate scrutiny is the correct standard to apply to prohibition on dirk knives and police batons, in light of the availability of many "other options for possessing protected weapons in the home," and noting that "courts throughout the country have nearly universally applied some form of intermediate scrutiny" in Second Amendment cases); *State v. Hermann*, 873 N.W.2d 257, 260 (Wis. Ct. App. 2015) (applying intermediate scrutiny in as-applied challenge to switchblade prohibition). There is no reason for this Court to take a different approach here.

The appropriateness of intermediate scrutiny in this case is underscored by more than a century's worth of history. Weapons far less deadly than firearms have long been regulated in different ways and for a variety of reasons. For instance, laws prohibiting the sale or possession of a weapon known as a "slung shot" (a small weighted ball attached to a rope) were enacted in fourteen states and the District of Columbia between 1850 and 1931. Mass. Gen. Laws ch. 194, §§ 1–2 (1850); 1890 Okla. Sess. Laws 475–76, ch. 25 §§ 18–19; 1907 Ala. Acts 80, No. 55; 1931 N.Y. Laws 1033; Pub. L. No. 275, § 14, codified at 47 Stat. 650 (1932). The same is true for brass knuckles. 1906 Va. Acts 9, ch. 11; 1923 Cal. Stat. 695, ch. 339, § 1. Ten states and the District of Columbia prohibited billy clubs and weapons called "sandbags" between 1889 and 1932, while at least fifteen states prohibited various types of knives between 1837 and 1959. 1912 N.J. Laws 365; 1925 N.J. Laws 185; 1837 Ala. Acts 7, No. 11; 1931 Tenn. Priv. Acts 1089; 1959 N.M. Laws 245. Even Congress, in 1958, passed a law prohibiting the sale or manufacture of switchblades in interstate commerce, carrying a punishment of up to five years in prison. Pub. L. No. 85-623, codified at 72 Stat. 562. As these laws illustrate, the people's elected representatives have long had leeway in assessing the dangerousness of weapons and determining whether (and how) to regulate them. This leeway is consistent with intermediate scrutiny.

## CONCLUSION

The Court should grant the defendants' motion to stay the proceedings for the reasons given in that motion. Should the Court deny the motion and decide to reach the merits, it should reject the plaintiffs' request (at 1) to invalidate the law as "categorically unconstitutional." Should the Court conclude that the Second Amendment is implicated, it should apply intermediate scrutiny rather than strict scrutiny.

Respectfully submitted,

*/s/ Deepak Gupta*

DEEPAK GUPTA
JONATHAN E. TAYLOR
GUPTA WESSLER PLLC
1735 20th Street, NW
Washington, DC 20009
(202) 888-1741
*deepak@guptawessler.com*

MARK ANTHONY FRASSETTO
EVERYTOWN FOR GUN SAFETY
P.O. Box 4184
New York, NY 10163

September 16, 2016

*Counsel for Amicus Curiae*
*Everytown for Gun Safety*