**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| CRYSTAL WRIGHT, et al. | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Civil Action No. 1:16-cv-1556 (JEB) |
| v. | ) | |
| | ) | |
| DISTRICT OF COLUMBIA, et al. | ) | |
| | ) | |
| Defendants. | ) | |

**REPLY TO OPPOSITION TO APPLICATION FOR PRELIMINARY AND PERMANENT INJUNCTION**

Plaintiffs Crystal Wright, Brendan Turner and Traci Dean ("Plaintiffs"), by counsel, reply to the District of Columbia's ("District or DC") Opposition to Plaintiffs' Application for Preliminary and Permanent Injunction. In support, the following is shown.

## I. Introduction and Summary.

The District's response to Plaintiffs Application For Preliminary and Permanent Injunction is remarkable in that it appears to be the first time DC has declined to defend the Constitutionality of one of its laws prohibiting residents and visitors to the city from keeping and bearing arms. What is perhaps even more remarkable is, given the DCs effective concession that Plaintiffs have shown they will prevail on the merits of their claim that the ban on electronic weapons violates the Constitution's Second Amendment, the District nevertheless opposes an injunction against enforcement of its now admittedly unconstitutional regulation. In light of the District's concession, its argument that Plaintiffs have not shown irreparable injury swims upstream against a torrent of contrary precedent.

And since enforcement of an unconstitutional statute is by definition contrary to the public interest, the District's assertion that the public interest will be disserved by enjoining this unconstitutional regulation cannot be credited. Plainly, given the DC's failure to advance even a make weight argument in favor of the electronic arms ban, the balance of harms analysis fails squarely on the side of enjoining enforcement of the Taser/stun gun ban.

Accordingly, the requested preliminary and permanent injunctions should issue.

## II. The record plainly supports issuance of a preliminary injunction enjoining enforcement of the electronic arms ban.

### a. The District effectively concedes that its Taser/stun gun ban violates the Second Amendment, and thus Plaintiffs will succeed on the merits.

Plaintiffs and Defendants agree on the well-established four-fold test for grant of a preliminary injunction. The injunction proponent must show: (1) a likelihood of success on the merits, (2) irreparable injury in the absence of an injunction, (3) the balance of equities tips in favor of the injunction, and (4) the injunction is in the public interest. Doc. 9.1 at 7, citing *Aamer v. Obama*, 742 F.3d 1023, 1038 (D.C. Cir. 2014); Doc. 10 at 4, citing *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011).[1]

Plaintiffs' Application made a comprehensive showing of the likelihood of success on the merits. Doc. 9.1 at 7-29. Plaintiffs explained that DC law prohibits law abiding persons such as themselves from possessing Tasers or stun guns, even in the home where

---

[1] The District's claim that Plaintiffs must show an even higher burden than the traditional four-part preliminary injunction test, *see* Doc. 10 at 5-6, is not the law of this circuit. *See Davis v. Billington*, 76 F. Supp. 3d 59, 69 n.15 (D.D.C. 2014). Nevertheless, given that the District does not defend the Constitutionality of the electronic weapons ban, Plaintiffs have plainly shown they are "clearly entitled to immediate relief." *See* Doc. 10 at 6.

Second Amendment rights are without question at their zenith. Doc. 9.1 at 7, citing *Dearth v. Holder*, 791 F.3d 32, 40-42 (2015) (Henderson, J., dissenting). Plaintiffs further demonstrated that Tasers and stun guns are arms under the Second Amendment. Doc. 9.1 at 8-12. They are bearable arms and thus prima facie covered by the Second Amendment. *Caetano v. Massachusetts*, 557 U.S. __, 136 S.Ct. 1027 (2016); *District of Columbia v. Heller*, 554 U.S. 570, 582 (2008); Doc. 9.1 at 9-10. Furthermore, Plaintiffs showed Tasers are not unusual and dangerous. Doc. 9.1 at 12-20. In fact, Plaintiffs showed that Tasers are safer weapons than clubs, knives, or personal weapons (i.e., hands, feet, elbows and knees) both as to the assailant against whom such weapons are deployed and the defending (weapon wielding) victim. Doc. 9.1 at 13-18. Plaintiffs further pointed out that the District's ban is a broad prohibition on the use of a protected arm and that while a narrower provision might withstand Constitutional scrutiny, the instant prohibition plainly cannot. Doc. 9.1 at 21-23. Because the Taser/stun gun ban sweeps so broadly, Plaintiffs showed it cannot meet any heightened standard of Constitutional scrutiny. Doc. 9.1 at 23-29.

The District offers not a single word to suggest Plaintiffs will not succeed on the merits. Despite this most important element of the four-part test, the District chose not to contest Plaintiffs' showing in this regard at all. *See generally* Doc. 10. The District does not contest that electronic arms fall within the protection of the Second Amendment. The District does not suggest electronic arms are dangerous and unusual arms.[2] The District

[2] In discussing another element of the test for issuance of a preliminary injunction, the District cites the claim of Amnesty International that some 500 persons have died in police custody after undergoing a Taser exposure. Doc. 10 at 18 & n.6. That claim will be discussed ante. Significantly, the District, which has chosen to equip at least some of its own officers with Tasers,

does not at any point suggest the ban on electronic arms comports with the Second Amendment. Indeed, the District appends to its Opposition a letter from DC Council Chairman Phil Mendelson responding to a memorandum from the DC Attorney General which appears to advise Mr. Mendelson of the Constitutional infirmity of the Taser/stun gun ban. Doc. 10.2. In response to the Attorney General's memorandum, Mr. Mendelson states he will work with the chair of the council judiciary committee "to enact necessary legislative amendments to ensure the District is in compliance with the Constitution. Doc. 10.2. Given the District's response, it has effectively conceded the unconstitutionality of its Taser/stun gun ban. Since the District is not contesting the unconstitutionality of its Taser/stun gun ban, without regard to the other three elements required for grant of a preliminary injunction, the Court can move immediately to issuing a permanent injunction against enforcement of the electronic arms ban.

**b. The District's claim that plaintiffs have not shown irreparable injury is contrary to binding precedent.**

Plaintiffs' showing of irreparable injury was simple. The law in this circuit as the D.C. Circuit has explained is that,

> "[s]uits for declaratory and injunctive relief against the threatened invasion of a constitutional right do not ordinarily require proof of any injury other than the threatened constitutional deprivation itself." *Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013) (brackets omitted) (quoting *Davis v. District of Columbia,* 158 F.3d 1342, 1346 (D.C. Cir. 1998)). Thus, "although a plaintiff seeking equitable relief must show a threat of substantial and immediate irreparable injury, a prospective violation of a constitutional right

---

does not rely on this claim to argue Tasers are of such a degree of dangerousness as to be able to be banned under the Second Amendment. *See* Emily Miller, *DC police chief changes policy, will allow some officers to carry Tasers,* Fox 5 News (October 28, 2015), available at http://www.fox5dc.com/news/local-news/40359383-story.

> constitutes irreparable injury for these purposes." *Id.* (brackets omitted) (quoting *Davis*, 158 F.3d at 1346).

Doc. 9.1 at 28. *See Mills v. District of Columbia,* 571 F.3d 1304, 1312 (D.C. Cir. 2009). *See also Elrod v. Burns,* 427 U.S. 347, 373 (1976) (Brennan, J., "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.) *Cf. Hubbard v. EPA*, 809 F.2d 1, 11 (D.C.Cir.1986) (there is a "presumed availability of federal equitable relief against threatened invasions of constitutional interests.") (quoting *Bivens v. Six Unknown Fed. Narcotics Agents*, 403 U.S. 388, 404, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971) (Harlan, J., concurring)). The D.C. Circuit's rule comports with the overwhelming weight of authority.[3]

---

[3] *See Pacific Frontier v. Pleasant Grove City*, 414 F.3d 1221, 1235 (10th Cir. 2005) ("We therefore assume that plaintiffs have suffered irreparable injury when a government deprives plaintiffs of their commercial speech rights."); *Tucker v. City of Fairfield*, 398 F.3d 457, 464 (6th Cir. 2005); *Joelner v. Village of Washington Park*, 378 F.3d 613, 620 (7th Cir. 2004); *Newsom v. Albemarle County. School. Board.*, 354 F.3d 249, 254 (4th Cir. 2003); *Brown v. California. Department of Transportation*, 321 F.3d 1217, 1225 (9th Cir. 2003); *Overstreet v. Lexington Fayette Urban County Government*, 305 F.3d 566, 578 (6th Cir. 2002) ("Courts have also held that a plaintiff can demonstrate that a denial of an injunction will cause irreparable harm if the claim is based upon a violation of the plaintiff's constitutional rights"); *Tenafly Eruv Association, Inc. v. Borough of Tenafly*, 309 F.3d 144, 178 (3d Cir. 2002) ("Limitations on the free exercise of religion inflict irreparable injury"); *Fifth Avenue Presbyterian Church v. City of New York*, 293 F.3d 570, 574 (2d Cir. 2002); *Siegel v. LePore*, 234 F.3d 1163, 1178 (11th Cir. 2000); *Iowa Right to Life Committee*, *Inc. v. Williams*, 187 F.3d 963, 970 (8th Cir. 1999); *Covino v. Patrissi*, 967 F.2d 73, 77 (2d Cir. 1992) (alleged violation of Fourth Amendment rights); *Miss. Women's Medical Clinic v. McMillan*, 866 F.2d 788, 795 (5th Cir. 1989); *Ross v. Meese*, 818 F.2d 1132, 1135 (4th Cir.1987) (fourth amendment); *Mitchell v. Cuomo*, 748 F.2d 804, 805–06 (2d Cir. 1984) (holding that the presumption applies to Eighth and Fourteenth amendment rights against cruel and unusual punishment); *McDonell v. Hunter*, 746 F.2d 785, 787 (8th Cir. 1984) (observing that a violation of privacy constitutes an irreparable harm). *See also* 11A C. WRIGHT, A. MILLER, & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE, § 2948.1 at 161 (2d ed. 1995) ("When an alleged deprivation of a

The District, letting its historic disdain for the Second Amendment get the better of it, nonetheless claims there should be a different rule for Second Amendment rights. It argues,

> The right to keep and bear arms, however, has no intrinsic value – it is not an end in itself. Rather, Second Amendment rights are instrumental. *McDonald,* 561 U.S. 742, 787 (2010). It is "the inherent right of self-defense" that is "central to the Second Amendment," *Heller I*, 554 U.S. at 628, and if no occasion arises where a weapon is needed for self-defense, its absence cannot cause harm. Just as it would be wrong to presume irreparable harm from a Sixth Amendment deprivation absent prosecution, see *McDonald,* 561 U.S. at 787, it is wrong to presume irreparable harm from a temporary potential Second Amendment deprivation absent non-speculative physical threat.

Doc. 10 at 14-15. Numerous problems exist with this argument. Among them, contrary to the implication of the District's Opposition, is the Supreme Court did not hold in *McDonald* that because Second Amendment rights are "instrumental" they are deserving of any lesser degree of protection than other Constitutional rights. Indeed, in the portion of *McDonald* the District cites, the Court rejected Chicago's similar argument to what the District is arguing here. Nothing in *McDonald* thus calls into question application of the rule that violations of Constitutional rights even for a brief period constitute irreparable injury.[4]

Secondly, the District's view that loss of Second Amendment rights, absent an imminent attack, have no value, has been rejected by the two judges of this court to whom

---

constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary.").

[4] And nothing in the cited passage from *McDonald* suggests that denial of the right to counsel would only constitute irreparable injury upon indictment.

the argument has been presented.[5] In *Wrenn v. District of Columbia,* Civil Action No. 15-162 (CKK) (March 7, 2016), appeal pending, Case No. 16-7025 (D.C. Cir.), plaintiffs claimed the District violated the Second Amendment by requiring them to show they had a "good reason" for issuance of a pistol carry license beyond a general desire to carry a firearm for self-defense. Although denying the preliminary injunction for other reasons, Judge Colleen Kollar-Kotelly, rejected the exact argument the District is making here, holding the allegation of loss of Second Amendment rights constituted irreparable injury:

> [T]he Court sees no basis in the case law to conclude that the particular alleged constitutional violation in this case is more or less of an irreparable injury than the violations of other constitutional provisions discussed by the parties. *Cf. Chaplaincy of Full Gospel Churches*, 454 F.3d at 303 ("It is unclear what, exactly, movants alleging an Establishment Clause violation could show to differentiate between establishments that inflict irreparable harm and those that do not.").
>
> The claim that Plaintiffs' constitutional rights were violated by the denial of the individual Plaintiffs' license applications and by the alleged futility of the applications of other members of the Second Amendment Foundation is, therefore, a sufficient basis for the Court to conclude that Plaintiffs have satisfied the irreparable harm prong of the preliminary injunction analysis.

Slip op. at 26-27.

DC made the same argument in *Grace v. District of Columbia,* Civil Action No. 15-2234 (RJL), appeal pending Case No. 16-7067 (D.C. Cir.). Judge Richard Leon, in granting the preliminary injunction in that case, disposed of the District's argument thusly:

> Defendants, not surprisingly, argue that this proposition should not apply to Second Amendment harms because the right to keep and bear arms is "inherently different" from other constitutional rights in that it "has no

---

[5] Plaintiffs' concern for their safety is not a mere academic exercise. Mr. Turner has twice been robbed at gun point and Ms. Wright has been threatened with serious bodily harm. *See* Doc. 9.2, at para. 3; Doc. 9.4, at para. 2.

> intrinsic value." Defs.' Opp'n 39-40. In defendants' view, "[i]f no occasion arises where a handgun is needed for self-defense," the denial of the Second Amendment right to bear arms "cannot cause harm." Defs.' Opp'n 40. What poppycock! Just because present plaintiffs "have not identified a single instance when their inability to carry a handgun caused them injury," does not mean they have failed to demonstrate a likelihood of irreparable harm. Defs.' Supplemental Br. 1 [Dkt. #39]. Once again, defendants, sadly, miss the point. The Second Amendment protects plaintiffs' right to bear firearms for self-defense—a right that can be infringed upon whether or not plaintiffs are ever actually called upon to use their weapons to defend themselves. *See Ezell*, 651 F.3d at 699 (explaining that, like other constitutional rights, "[t]he Second Amendment protects . . . intangible and unquantifiable interests," which "cannot be compensated by damages"). The right to bear arms enables one to possess not only the means to defend oneself but also the self-confidence—and psychic comfort—that comes with knowing one could protect oneself if necessary. Moreover, while this Court is not permitted to recognize "a hierarchy among . . . constitutional rights," *Caplin & Drysdale, Chtd v. United States*, 491 U.S. 617, 628 (1989), the Supreme Court has nevertheless made clear that the Second Amendment is not a "second-class right," *McDonald*, 561 U.S. at 780-81 (plurality). Thus, because plaintiffs are likely to succeed in showing their Second Amendment rights are being infringed each and every day the District continues to enforce the "good reason" requirement, they have more than adequately demonstrated irreparable injury.

Slip op. at 41-42.

Judge Leon's analysis is correct. The right enshrined in the Second Amendment is the right to be armed in the event of confrontation, i.e., in advance of having to defend oneself. *Heller,* 554 U.S. at 592 ("Putting all of these textual elements together, we find that they guarantee the individual right to possess and carry weapons in case of confrontation.") The very nature of a violent criminal encounter is that it almost always happens with little or no warning. There is no time for a woman to run to 333 Constitution Avenue, NW, and seek an injunction against the Taser ban as the rapist is pulling her into his van. For Second Amendment rights to have any "instrumental" value, they need to be

protected before the criminal attack. That is why their denial is irreparable. Once the attack is in progress, it is too late.

DC cites no authority to treat Second Amendment rights any differently than other Constitutional rights for the irreparable injury requirement. Given established and binding circuit precedent, the conclusion Plaintiffs have shown irreparable injury is manifest.

The District also claims Plaintiffs' are not irreparably injured by the electronic arms ban because they have other arms available for self-defense, including the ability to apply for a handgun carry permit or to carry self-defense spray. Doc. 10 at 16. That argument must be rejected as well.

First, the District's argument that the electronic weapons ban is not a "categorical" ban like that struck down in *Heller, see Id.,* is nonsense. *Heller* struck down a flat ban on the possession of handguns and a flat ban on the ability to use a functional firearm for self-defense. *Heller,* 554 U.S. at 630. The electronic arms ban is a flat ban on all electronic weapons and is thus as much a categorical ban on that class of weapons, as was *Heller's* ban on the use of functional firearms. Indeed, *Heller* involved a significantly less restrictive ban on firearms than DC has imposed here. At least in *Heller* District residents could own shotguns and non-semi-automatic rifles. *Id*. at 575. Here the District totally bans all electronic weapons, a ban significantly more restrictive than that at issue in *Heller*.

Secondly, *Heller* specifically rejected the District's claim it could ban hand guns because shotguns and some rifles could be possessed. *Id.* at 629. The court explained in some detail the potential advantages of hand guns over long guns for self-defense and

concluded that their complete ban was unconstitutional. *Id.* at 630.[6] Here, Plaintiffs explained in detail why Tasers were a preferable arm over firearms, defense sprays and contact weapons. Plaintiffs explained, including via expert testimony, that defense sprays are ineffective on highly intoxicated or emotionally deranged individuals. *See* Doc. 9.1 at 14 & Doc. 9.5, Kroll Declaration, at paras 7-11 & 30-31. Plaintiffs explained the risk of using contact weapons for self-defense. Doc. 9.1 at 12 n.3 & 15. Plaintiffs also explained why the use of firearms for self-defense presents risks to victims and other innocents, including the potential for self-inflicted injuries, guns being taken away by assailants, missed shots, criminal and civil liability, and the emotional and psychological toll associated with killing another human being no matter how justified the killing may be. *See* Doc. 9.1 at 15-19. The District did not contest one word of this showing.

Moreover, specifically as to the District's suggestion that Plaintiffs could use firearms for self-defense, Plaintiff Brendan Turner explained that he has a child at home and is therefore uncomfortable having a firearm in the house. Doc.9.4 at para. 5. Plaintiff Traci Dean also explained she is uncomfortable possessing a firearm for self-defense. Doc. 9.3 at paras. 3-11. And although Plaintiff Crystal Wright has trained with firearms and may in fact obtain one for self-defense, she as well as each of the other Plaintiffs is aware

---

[6] The Court there stated:

> There are many reasons that a citizen may prefer a handgun for home defense: It is easier to store in a location that is readily accessible in an emergency; it cannot easily be redirected or wrestled away by an attacker; it is easier to use for those without the upper-body strength to lift and aim a long gun; it can be pointed at a burglar with one hand while the other hand dials the police. Whatever the reason, handguns are the most popular weapon chosen by Americans for self-defense in the home, and a complete prohibition of their use is invalid.

of the substantial risks associated with possessing and using lethal weapons. Doc. 9.2 at paras. 5-12. DC over the years has spent considerable effort defending its gun laws based on the safety risks of firearms. Forcing Plaintiffs who accept at least in part the District's characterization of the dangers of guns, to nevertheless rely on them for self-protection, rather than on an arm that poses significantly fewer such risks, is particularly inequitable. Furthermore, the District's claim that Plaintiffs could apply for gun carry licenses, Doc. 10 at 16, is particularly disingenuous given that the DC's carry license scheme is so restrictive that reportedly fewer than 90 such licenses have been issued to date.[7]

In sum, that other self-defense arms may be available to Plaintiffs does not ameliorate the irreparable Second Amendment injury inflicted on them by DC's electronic weapons ban.

**c. The balance of harms analysis plainly supports grant of a preliminary injunction.**

The District argues that in balancing the harm to parties, "the Court must … consider … also the general public." Doc. 10 at 16-17. The District quotes the Chief Justice's comment in *Maryland v. King*, 133 S.Ct. 1, 3 (2012) (Roberts, C.J., in chambers), that anytime a statute is enjoined the state suffers "a form of irreparable injury." Although none can doubt the Chief Justice's words, they certainly do not stand for the proposition that no state statute should ever be preliminarily enjoined as unconstitutional. *King* involved a

[7] Ann E. Marimow, *The high court struck down D.C.'s gun ban eight years ago, but the fight continues*, The Washington Post (September 13, 2016), available at https://www.washingtonpost.com/local/public-safety/the-high-court-struck-down-dcs-gun-ban-eight-years-ago-but-the-fight-continues/2016/09/13/070e6786-7054-11e6-8365-b19e428a975e_story.html.

request for stay of a Maryland's Court of Appeals decision holding that Maryland's practice of taking DNA samples from arrestees for violent crimes violated the Fourth Amendment. This was a practice upheld previously by two separate federal circuit courts of appeals and the Virginia Supreme Court, and which was a practice followed by both the federal government and some one-half of states. *Id.* at 2. In addition, the Chief Justice found "an ongoing and concrete harm to Maryland's law enforcement and public safety interests," pointing out that the DNA collection program had resulted in 58 criminal prosecutions from 2009 to 2011. *Id.* at 3.

By contrast here, DC has declined to defend the constitutionality of the electronic weapons ban, the Supreme Court recently vacated on Second Amendment grounds a Massachusetts conviction for possessing a stun gun, *see Caetano,* 136 S.Ct. 1027 (after which the Commonwealth dropped the charge against Ms. Caetano), the overwhelming number of states allow possession and use of electronic weapons, and Michigan's ban on electronic weapons was held unconstitutional on Second Amendment grounds by that state's court of appeals, *see People v. Yanna,* 824 N.W.2d 241 (Mich. Ct. App. 2012). The District's declination to defend the Constitutionality of the electronic arms ban should be dispositive. There can be no credible claim the District is irreparably damaged by not enforcing an unconstitutional regulation when it won't even defend its Constitutionality.

Defendants cite *American Freedom Defense Initiative v. Washington Metropolitan Area Transit Authority*, 898 F.Supp.2d 73 (D.C. 2012), for the need to balance plaintiffs Constitutional claim against the defendants' "concern for a possible threat to the public." Yet, in that case Judge Rosemary Collier found that although "WMATA presented a

compelling concern for the safety of its passengers and its system, from individual disputes with calamitous consequences to a terrorist attack … its means to protect this interest were not the least restrictive necessary to achieve the goal." *Id.* at 84. Thus, she found the balance of interests fell on the side of the plaintiff's First Amendment rights. *Id.*

Here the District has made no showing (compelling or otherwise) that it will suffer any significant harm. What it does assert is that enjoining enforcement of the electronic arms ban will "inject uncertainty into an important public safety measure." Doc. 10 at 17. That claim borders on the frivolous. This public safety measure is so "important" to the District that it offered not one word to support its Constitutionality. But even putting that aside, the District never even articulates why its considers this admitted unconstitutional prohibition even to be an "important public safety measure." Something more than a bare assertion is certainly required.

DC goes on to complain that granting relief to the public at large, as opposed to "just the plaintiffs" would leave the District either without any regulation of electronic weapons or require the city to hastily cobble together a licensing regime." Doc. 10 at 17-18. It asserts it must consider the danger that Tasers or stun guns pose. *Id.* at 18. To that end, the District argues a proposition plaintiffs' have never contested: that electronic arms like all arms are not without risk. Plaintiffs readily admitted some injuries can result from a Taser exposure, most notably injuries from falls. Doc. 9.1 at 13-14 & Doc. 9.5 at para. 32. *See also* Doc. 9.6. And plaintiffs noted as well that Tasers and stun guns could be misused just like any other device, weapon or not. Doc. 9.1 at 24. However, plaintiffs also showed that Tasers are much safer to all parties, victim, innocent bystanders and perpetrator than guns,

knives, clubs, pepper sprays and personal weapons such as fists, feet, knees and elbows. Doc. 9.1 at 13-19. So the incremental harm that might result from unregulated use of those devices compared to much more lethal weapons is insubstantial and certainly not supported by any evidence the District has posited.

This fact is aptly illustrated by the District's being able to point to only two examples of criminal misuse of these devices, one in 2014 and one in 2013. Doc. 10 at 18. By contrast, criminal misuse of guns and knives occurs in DC on a daily, if not an hourly, basis despite the heavy regulation of firearms on both the federal and the District level.[8]

In a last ditch attempt to claim some need to keep its admittedly unconstitutional provision in force, DC cites to what it calls an Amnesty International study which claims some 500 persons have died after being Tased.[9] Assuming arguendo this figure is accurate, this amounts to a temporal not a causal relationship. For example, everyone who enters DC, will die thereafter, but the District generally is not the cause of their deaths. Significantly, Amnesty in a February 15, 2012 press release touting the 500 number figure, admitted, "Most of the deaths have been attributed to other causes. However, medical examiners have listed Tasers as a cause or contributing factor in more than 60 deaths, and

[8] If there were a substantial potential for criminal misuse of electronic weapons it would be widely reported given their widespread legality and minimal regulation throughout the United States. Indeed, unlike guns, electronic weapons enjoy no federal restriction on interstate transfers, *see* 18 U.S.C. §922(b)(3), nor any requirement for a background check, *see* 18 U.S.C. §922(s). Thus, DC criminals could readily cross the District border and purchase electronic arms to their depraved hearts' content. But that does not seem to happen, and given DC's experience with illegal guns, it is not because electronic arms are illegal in the District.

[9] Actually, the District cites to a news article writing *about* Amnesty's claim, rather than the supposed "study" itself. *See* Doc. 10 at 18 n.6.

in a number of other cases the exact cause of death is unknown." *See Amnesty International Urges Stricter Limits on Police Taser Use as U.S. Death Toll Reaches 500* (February 15, 2012), available at http://www.amnestyusa.org/news/press-releases/amnesty-international-urges-stricter-limits-on-police-taser-use-as-us-death-toll-reaches-500.

Courts have consistently refused to admit Amnesty's claims concerning Tasers. *See, e.g., Glowczenski v. TASER Intl, Inc.,* 928 F.Supp.2d 564, 577, 579 (E.D.N.Y. 2013) (excluding Amnesty International report as inadmissible); *Bachtel v. TASER Intl., Inc.,* 2:11-CV-00069 (JCH), 2013 WL 317538 (E.D. Mo. Jan. 28, 2013) (same); *Parker v. City of S. Portland,* CIV 06-129-P-S, 2007 WL 1468658 (D. Me. May 18, 2007) aff'd, 2007 WL 2071815 (D. Me. July 18, 2007) (same).

What Amnesty is reporting is a phenomena called "Arrest Related Death." As Dr. Kroll has pointed out,

> Arrest-related-death (ARD) is a well-recognized syndrome often with no clear single pathological mechanism or obvious anatomical or toxicological basis. Annually there are about 800,000 arrests in which force is used in North America and approximately 800 ARDs yielding a mortality rate of about 1:1000 for a law-enforcement interaction associated with force. About 80% of resistant subjects have co-morbidities of mental illness, drug abuse, or intoxication; the majority have at least 2 of these. The conducted electrical weapon (CEW) is involved in a minority of ARDs. The largest manufacturer, TASER International tracks the number of field uses based on sales and known usage patterns. This is continuously updated on their website and reveals 2.98 million field uses as of January 2016 (https://www.taser.com/lives-saved). There have also been 1.95 million CEW training exposures for a total of ~5 million human CEW exposures.

Mark Kroll, et al., *Fatal traumatic brain injury with electrical weapon falls,* 43 Journal of Forensic and Legal Medicine 12, 12 (2016) (footnotes omitted) (Exhibit 1, hereto).

Someone does not just get Tased and dies. If that were so, it would be apparent in the course of some two million Taser exposures that officers have undergone in training. The reality of a resisted arrest scenario is that it is a violent encounter, a fight. During that fight a suspect may face multiple officers trying to subdue him, he may be pepper sprayed, Tased, subjected to multiple officers physically restraining him, and eventually handcuffed to gain compliance. Add on top of that a hefty dose of stress hormones mixed with dangerous drugs such as cocaine, PCP, and the ever widening list of "designer drugs" coming on the street, and it would come as no surprise that some suspects' hearts cannot take the stress imposed on their systems in such a fight. In fact, those very confrontations also take their toll on officers. Hundreds of officers die from sudden coronary death every year after subduing resisting subjects. *See* Vasileia Varvarigou, *Law enforcement duties and sudden cardiac death among police officers in United States: case distribution study*, 2014 British Medical Journal 349, available at http://www.bmj.com/content/349/bmj.g6534 ("Compared with routine/non-emergency activities, the risk of sudden cardiac death was 34-69 times higher during restraints/altercations, 32-51 times higher during pursuits, 20-23 times higher during physical training, and 6-9 times higher during medical/rescue operations.") That is one of the reasons why early use of a Taser in such situations lessens the chance for officer and suspect injuries. The implication for citizen use of Tasers is clear. Stopping a violent attack as fast as possible without victim/assailant physical contact would greatly lessen the potential for serious victim injury or attacker injury.

In May of 2011, The Department of Justice released the results of a comprehensive study of deaths following Taser use. Its core finding was as follows:

> Unlike the risk of secondary injury due to falling or puncture, the risk of human death due directly or primarily to the electrical effects of CED application has not been conclusively demonstrated. However, there are anecdotal cases where no other significant risk factor for death is known. Additionally, current research does not support a substantially increased risk of cardiac arrhythmia in field situations, even if the CED darts strike the front of the chest. There are anecdotal cases where no other significant risk factor for death is known and where the temporal association provides weak circumstantial evidence of causation. The panel reviewed studies on ventricular fibrillation with respect to dart placement, demonstration of ventricular fibrillation, pulseless ventricular tachycardia, pulseless electrical activity in animals, and anecdotal examples of capture in humans wearing cardiac pacemakers or defibrillators. These studies suggest plausible but unproven mechanisms for unusual and rare cases of death due to a confluence of unlikely circumstances.

U.S. Department of Justice, NIJ, *Study of Deaths Following Electro Muscular Disruption,* viii (May, 2011) (Exhibit 2, hereto). The study goes on to say, "All evidence suggests that the use of CEDs carries with it a risk as low as or lower than most alternatives. While it should be remembered that unlikely events may occur, it is unreasonable to demand that any application of force be totally risk-free in all populations at all times." *Id.* at 24.

The District complains a preliminary injunction will invalidate its unconstitutional prohibition as to everyone without a regulatory scheme in place. That is a product of the DC's own inaction after it knew or should have known its electronic arms prohibition was unconstitutional. The District plainly had notice of the likely unconstitutionality of its electronic arms ban by 2012 when the *Yanna* case was decided. And it certainly was aware of the likely invalidity of the ban once the Supreme Court decided *Caetano* in March of this year. Indeed, undersigned counsel met with Council Chairman Mendelson in March

of 2014 and advised him of the Constitutional infirmity of the electronic arms ban. *See* Exhibit 3, hereto (Revisions Needed to DC's Firearm and Self-Defense Laws, at 19-20 (Undated) and February 14, 2014 email transmitting written discussion of matter.) Counsel suggested that registration of the devices and a prohibition on possession by felons or others with a propensity toward violence would survive Constitutional scrutiny. *Id.* at 20. Rather than make any effort to address the Constitutional issues of the absolute ban on electronic arms, DC chose to sit on its laurels and wait to be sued. That hardly gives the city any serious claim to "equities" against the entrance of a preliminary injunction here.

Although the city has not shown any public safety threat from issuance of a preliminary injunction with citywide application, Plaintiffs would not object to issuance of a preliminary injunction limited only to themselves, as to which the District apparently does not object, and Plaintiffs have no objection to a condition of the preliminary injunction that they notify the Metropolitan Police Department upon acquisition of an electronic arm. *See* Doc. 10 at 19.

**d. Grant of the preliminary injunction is in the public interest.**

DC agrees with Plaintiffs that enforcement of an unconstitutional law is always contrary to the public interest, Doc. 9.1, at 32; Doc. 10 at 20; but argues that a final determination of Constitutionality of the electronic arms ban should await full development of the record, including discovery, expert testimony and briefing. Doc. 10 at 20.

The problems with the District's position, however, are three-fold. First, the District's argument would apply to any case where the Constitutionality of a statute was at issue. Does the District really believe no statute should be preliminarily enjoined no matter

how facially unconstitutional? In reality, however, where there is a strong showing of likely unconstitutionality, the Court can safely conclude the public interest would be served by enjoining enforcement of the provision. Second, the District has pointed to absolutely no discovery or expert testimony needed to resolve the issue of the electronic arms ban. At the very least the District owed the Court the courtesy to provide some degree of specificity in this regard. After all, it is not like the District was rushed in filing its Opposition; the Court gave it a month to respond to the preliminary injunction request. Third, once again, the District has conceded the unconstitutionality of the electronic arms ban by failing to make any showing in response to Plaintiffs' showing on the merits. *See* pages 3-5, *supra*. Rather, the District asks the Court to stay this proceeding so that the city council can enact "legislative amendments to ensure the District is in compliance with the Constitution." Doc. No. 10.2. This is fatal to any claim that the public interest would be served by denial of the requested preliminary injunction since the public interest is not served by enforcing an admitted unconstitutional provision.

**III. The District's failure to offer any defense of the Constitutionality of the electronic arms ban merits issuance of a permanent injunction now.**

The District claims the Court should not enter a permanent injunction "in light of the time restrictions imposed by the procedures applicable to preliminary injunctive relief." Doc. 10, at 20. That argument is vacuous given that the court gave the District a month to respond to the preliminary injunction application and the District fails to make any claim the Taser ban is Constitutional.

Plaintiffs agree with the District that it is generally inappropriate to give final judgment on the merits at the preliminary injunction stage. Doc. 10 at 21. That is why Plaintiffs phrased their request as follows,

> Plaintiffs suggest that unless the District can make an adequate showing of the need to develop a factual record to support their Taser ban, a permanent injunction is appropriate now. In that regard the court should require the District to identify the specific areas appropriate for discovery and resolution at trial. In the absence of such issues, the final outcome of this case will not depend on any facts presented at trial, and there would be no "genuine uncertainty at the preliminary injunction stage concerning what that outcome will be." *See Curtis 1000 [v. Suess],* 24 F.3d [941, 945 (7th Cir. 1994)].

Doc. 9.1 at 33. The District declined to make any showing of the need to develop a factual record to support the electronic weapons ban. Indeed, it made no showing whatever to support the Constitutionality of the prohibition. Having thus conceded the merits of Plaintiffs' claim, this matter is ripe for issuance of a permanent injunction against enforcement of the electronic weapons prohibition.

## IV. The brief of amicus Everytown raises no decisionally significant issue.

Amicus Everytown For Gun Safety argues two points which are of largely academic interest.[10] First, it argues a point Plaintiffs do not make: that the protection of an arm is dependent on being commonly owned. That is not what *Heller* says and is not what Plaintiffs argue here. What *Heller* does stand for is that possession and carry of commonly owned arms used for self-defense are prima facie protected by the Second Amendment.[11]

---

[10] Like DC, Everytown, does not attempt to defend the Constitutionality of the electronic arms ban. Doc. 14 at 1. In light of that omission, its brief is inconsequential to this case.

[11] Everytown suggests that common use implies some numerical test. Doc. 14 at 2. That does not follow. Machetes are commonly owned and capable of use as a weapon, but they are not commonly owned and used for self-defense. A statute prohibiting the concealed carry of such an

*Heller* goes on to say that dangerous *and* unusual, i.e., unusually dangerous, arms can be restricted. Whatever else you can say about Tasers and stun guns, they are significantly less dangerous than guns, knives and impact weapons and they are certainly not unusual.

Everytown's second point is that all Second Amendment cases should employ intermediate scrutiny. Doc. 14 at 7-8. In support, it cites a number of cases where courts have purported to apply intermediate scrutiny in analyzing Second Amendment claims. *See* Doc. 14 at 8. Everytown's simplistic analysis gets no support from either *Heller or McDonald* where the court employed the categorical approach Everytown eschews. Nor does circuit precedent support Everytown's position. It is true that *Heller v. District of Columbia,* 670 F.3d 1244, 1256-57 (D.C. Cir. 2011) applied intermediate scrutiny to the District's gun registration and assault weapon laws. But why it did so, which Everytown declines to address, is key to understand the level of Constitutional scrutiny to be applied in a Second Amendment case. The court explained:

> As with the First Amendment, the level of scrutiny applicable under the Second Amendment surely "depends on the nature of the conduct being regulated and the degree to which the challenged law burdens the right." *Chester,* 628 F.3d at 682; *see also Turner Broad. Sys., Inc. v. FCC (Turner I),* 512 U.S. 622, 642, 114 S.Ct. 2445,129 L.Ed.2d 497 (1994) ("regulations that are unrelated to the content of speech are subject to an intermediate level of scrutiny because in most cases they pose a less substantial risk of excising certain ideas or viewpoints from the public dialogue" (citation omitted)); *Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio,* 471 U.S. 626, 651, 105 S.Ct. 2265, 85 L.Ed.2d 652 (1985) ("We recognize that unjustified or unduly burdensome disclosure requirements might offend the First Amendment by chilling protected commercial speech. But we hold that an advertiser's rights are adequately protected as long as disclosure requirements are reasonably related to the

---

instrument would likely survive Constitutional analysis. *See, e.g.,* Va Code § 18.2-308(A) (prohibiting carrying concealed, a machete and various other rather unusual weapons).

> State's interest in preventing deception of consumers."); Nelson Lund, *The Second Amendment,* Heller, *and Originalist Jurisprudence,* 56 UCLA L. Rev. 1343, 1376 (2009) ("The case law dealing with free speech and the free exercise of religion provides a particularly good analogue" for Second Amendment). That is, a regulation that imposes a substantial burden upon the core right of self-defense protected by the Second Amendment must have a strong justification, whereas a regulation that imposes a less substantial burden should be proportionately easier to justify. *See Turner I,* 512 U.S. at 661, 114 S.Ct. 2445 ("must-carry provisions do not pose such inherent dangers to free expression ... as to justify application of the most exacting level of First Amendment scrutiny"; rather, "the appropriate standard ... is the intermediate level of scrutiny applicable to content-neutral restrictions that impose an incidental burden on speech"); *Board of Trustees of State Univ. of N.Y. v. Fox,* 492 U.S. 469, 477, 109 S.Ct. 3028, 106 L.Ed.2d 388 (1989) ("commercial speech [enjoys] a limited measure of protection, commensurate with its subordinate position in the scale of First Amendment values" (internal quotation marks omitted)); *Buckley v. Valeo,* 424 U.S. 1, 44–45, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) ( "expenditure limitations" are subject to "exacting scrutiny applicable to limitations on core First Amendment rights of political expression" because they impose a "great[ ] burden on basic freedoms"); *Ezell,* 651 F.3d at 703 (level of scrutiny "will depend on how close the law comes to the core of the Second Amendment right and the severity of the law's burden on the right"); *see also* Eugene Volokh, *Implementing the Right to Keep and Bear Arms for Self–Defense: An Analytical Framework and a Research Agenda,* 56 UCLA L. Rev. 1443, 1471 (2009) ("Ballot access regulations are ... subject to strict scrutiny if they 'impose a severe burden on associational rights,' but to a much weaker level of scrutiny if they 'impose[ ] only modest burdens' " (quoting *Wash. State Grange v. Wash. State Republican Party,* 552 U.S. 442, 128 S.Ct. 1184, 1191–92, 170 L.Ed.2d 151 (2008))); Winkler, *supra,* at 698 ("Strict scrutiny ... does not apply to fundamental, preferred rights when the courts determine that the underlying burden is only incidental").

*Id.*

Thus, the teaching of *Heller II* is that the court should look at the degree to which a regulation burdens the core Second Amendment right of self-defense in determining the level of scrutiny. The court there found intermediate scrutiny appropriate where the regulations prohibited only a subset of semi-automatic rifles (those classified as assault

rifles) and detachable magazines (those holding more than 10 rounds). *See Id.* at 1261-62. Significantly, the court held that plaintiffs had presented scant evidence that these arms were commonly used for self-defense. *Id* at 1261. Various other cases amicus cites all involved something considerably less than a ban on an entire class of arms.[12] By contrast, this case does involve a ban on an entire class of arms commonly used for self-defense.

## V. Conclusion.

Plaintiff has shown all the requisites for grant of a preliminary injunction. It has shown the likelihood of success on the merits, a showing the District did not even try to rebut. It has showed irreparable injury via its claim that the District electronic arms ban

---

[12] *N.Y. State Rifle and Pistol Ass'n v. Cuomo*, 804 F.3d 242, 261 (2d Cir. 2015) was another assault weapons case. *See also Kolbe v. Hogan*, 813 F.3d 160 (4th Cir. 2016), en banc granted. *United States v. Marzzarella*, 614 F.3d 85, 97 (3d Cir. 2010) involved possession of a firearm with an obliterated serial number, a matter of minimal impingement of the right to bear arms. *State v. DeCiccio*, 105 A.3d 165 (Conn. 2014) involved possession of dirk knifes and police batons in a motor vehicle, rather than a total ban on possession of such devices. *State v. Hermann*, 873 N.W.2d 257, 260 (Wis. Ct. App. 2015) involved a prohibition on a subclass of knives, switchblades, finding the prohibition unconstitutional as to possession by defendant in his home.

All the other cases amicus cites involve classifications relating to prohibited persons, rather than regulation or prohibitions of arms themselves. *See United States v. Booker*, 644 F.3d 12 (1st Cir. 2010) (domestic abusers); *United States v. Chester*, 628 F.3d 673 (4th Cir. 2010) (same); *United States v. Chovan*, 735 F.3d 1127 (9th Cir. 2013) (same); *National Rifle Ass'n v. Bureau of Alcohol, Tobacco, Firearms, and Explosives*, 700 F.3d 185 (5th Cir. 2012) (age restriction to purchase a handgun); *United States v. Williams*, 616 F.3d 685 (7th Cir. 2010) (felon possession prohibition); *Schader v. Holder*, 704 F.3d 980 (D.C. Cir. 2013) (misdemeanor conviction for which jail term could exceed two years); *United States v. Reese*, 627 F.3d 792 (10th Cir. 2010) (possession by person under a domestic abuse restraining order); *Dearth v. Lynch*, 781 F.3d 32 (D.C. Cir. 2015) (requirement to be a resident of a state to receive a transfer of a firearm); *Tyler v. Hillsdale Cnty. Sheriff's Dept.*, 2016 WL 4916936 (6th Cir. September 15, 2016) (prohibition on persons involuntarily committed to a mental hospital). The prohibited person classifications generally involve person (s historically not considered within the core of second amendment protection, for example, persons with a history of violence, minors, or mentally disabled. Application of intermediate scrutiny in those situations is certainly a different matter than applying it to a ban of an entire class of self-defense arms.

violates the Constitution. Under circuit precedent, indeed the overwhelming weight of nationwide precedent, that is all Plaintiffs were required to do. Defendants have not shown substantial harm to third parties or to the public interest. Indeed, in light that the District declined to defend the Taser ban on the merits, the District cannot possibly show harm would result from grant of the requested preliminary injunction. Nonetheless, Plaintiffs would not object to the Court's issuing a narrower injunction applying only to themselves, pending final judgment in the case.

For all of these reasons, the Court should preliminarily (as to Plaintiffs) and permanently enjoin enforcement of D.C. Code 7-2501.01(7)(D) and 7-2502.01(a) to the extent that they prohibit the sale, importation, possession and use of Tasers and stun guns by persons within the District of Columbia.

Respectfully submitted

**CRYSTAL WRIGHT**

**TRACI DEAN**

**BRENDAN TURNER**

/s/ George L. Lyon, Jr., DC Bar No. 388678
Arsenal Attorneys
2111 Wilson Blvd, 8th Floor
Arlington, Virginia 22201
Email: gll@arsenalattorneys.com
202-669-0442
Their Counsel

September 23, 2016